# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1010

_____

Hus Hari Buljic, individually and as administrator of the estate of Sedika Buljic; Honario Garcia, individually and as administrator of the estate of Reberiano Leno Garcia; Miguel Angel Hernandez, as co-administrator of the estate of Jose Luis Ayala, Jr.; Arturo de Jesus Hernandez, as co-administrator of the estate of Jose Luis Ayala, Jr.

*Plaintiffs - Appellees*

v.

Tyson Foods, Inc.; Tyson Fresh Meats, Inc.; John H. Tyson; Noel W. White; Dean Banks; Stephen R. Stouffer; Tom Brower

*Defendants - Appellants*

Mary Oleksiuk; Elizabeth Croston

*Defendant*s

Tom Hart

*Defendant - Appellant*

Hamdija Beganovic; James Cook; Ramiz Muheljic; Gustavo Cabarea; Pum Pisng; Alex Bluff; Walter Cifuentes; Muwi Hlawnceu

*Defendant*s

Cody Brustkern

*Defendant - Appellant*

Mark Smith; John Does 1-10

*Defendant*s

Bret Tapken; John Casey; James Hook

*Defendants - Appellants*

------------------------------

United Food and Commercial Workers International Union; State of California; State of Maryland; State of Delaware; State of Minnesota; State of Colorado; State of Connecticut; State of Hawaii; State of Illinois; State of Maine; State of Massachusetts; State of Michigan; State of Nevada; State of New Mexico; State of New York; State of Oregon; State of Pennsylvania; State of Rhode Island; State of Washington; State of Wisconsin; District of Columbia; United States; Public Justice

*Amici on Behalf of Appellee(s)*
_____

No. 21-1012
_____

Oscar Fernandez, individually, and as administrator of the estate of Isidro Fernandez

*Plaintiff - Appellee*

v.

Tyson Foods, Inc.; Tyson Fresh Meats, Inc.; John H. Tyson; Noel W. White; Dean Banks; Stephen R. Stouffer; Tom Brower

*Defendants - Appellants*

Mary Oleksiuk; Elizabeth Croston

*Defendant*s

-2-

Tom Hart

*Defendant - Appellant*

Hamdija Beganovic; James Hook; Ramiz Muheljic; Missia Abad Bernal; John and Jane Does 1-10

*Defendant*s

Cody Brustkern; John Casey; Bret Tapken

*Defendants - Appellants*

------------------------------

United Food and Commercial Workers International Union; State of California; State of Maryland; State of Delaware; State of Minnesota; State of Colorado; State of Connecticut; State of Hawaii; State of Illinois; State of Maine; State of Massachusetts; State of Michigan; State of Nevada; State of New Mexico; State of New York; State of Oregon; State of Pennsylvania; State of Rhode Island; State of Washington; State of Wisconsin; District of Columbia; United States; Public Justice

*Amici on Behalf of Appellee(s)*
_____

Appeals from United States District Court
for the Northern District of Iowa - Eastern
_____

Submitted: September 23, 2021
Filed: December 30, 2021
_____

Before KELLY, ERICKSON, and GRASZ, Circuit Judges.
_____

KELLY, Circuit Judge.

In these two cases, Plaintiffs-Appellees are relatives of individuals who worked at the Tyson Foods pork processing facility in Waterloo, Iowa, contracted COVID-19 (allegedly at work), and later died. Defendants-Appellants are Tyson Foods, executives of Tyson Foods, and supervisors at Tyson's Waterloo facility (collectively, Tyson). Plaintiffs assert claims for fraudulent misrepresentation and gross negligence, contending that Tyson's actions in March and April of 2020 caused their relatives' deaths. Tyson removed both cases to federal court and now appeals the district court's[1] orders remanding them to state court. We consolidated the cases and, having jurisdiction under 28 U.S.C. § 1447(d), now affirm.

## I. Background[2]

### A. The Federal Response to the COVID-19 Pandemic

On March 13, 2020, then-President Donald Trump declared the COVID-19 pandemic a national emergency. Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020). In the weeks and months that followed, the federal government took steps to stem the spread of the virus and to address disruptions in various industries. Some of those steps included working with certain industries to ensure they had the necessary supplies to continue operating. For example, on the same day that the President declared a national emergency, the Cybersecurity Infrastructure Security Agency (CISA) held a conference call with representatives of several industries, including Tyson, to discuss procuring and delivering critical supplies, such as

---

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa.

[2]The facts discussed in this section are drawn from the record evidence and from sources to which the parties specifically directed us in their briefing.

Personal Protective Equipment (PPE).  Similar communications continued over the following days and months.

Federal officials also publicly emphasized the importance of specific industries—including the meat-processing industry—and of maintaining operations during the pandemic.  On March 15, 2020, after holding a conference call with food industry representatives, President Trump announced that the food and retail sectors were "working hand-in-hand with the federal government as well as the state and local leaders to ensure food and essentials are constantly available," adding that the leaders assured him that "they're going to work 24 hours around the clock, keeping their store stocked."  At a press briefing on April 7, Vice President Mike Pence reiterated the importance of the food supply industry and thanked members of the industry—including Tyson—for keeping grocery store shelves stocked.

The United States Department of Agriculture (USDA), which regulates the meat-processing industry, similarly issued statements about responding to the pandemic.  In a March 16 statement, the USDA explained that it "remain[ed] committed to working closely with industry to fulfill [its] mission of ensuring the safety of the U.S. food supply and protecting agricultural health."  The statement noted that facility inspections would continue and that USDA field personnel would work closely with facility management and state and local health authorities.  A few days later, the USDA's Food Safety and Inspection Service (FSIS)—which is tasked with inspecting slaughterhouses and meat products—sent a letter to facility managers and FSIS field employees explaining that FSIS sought a "united effort" with industry partners and providing guidance about screening FSIS employees for COVID-19 at facilities.

As uncertainty grew and state and local officials adopted differing responses to the COVID-19 pandemic, the federal government issued additional guidance about the virus and about industries it considered critical.  On March 16, President Trump

issued the "Coronavirus Guidelines for America," which outlined specific steps aimed at slowing the spread of the virus. The Guidelines also stated that employees who "work in a critical infrastructure industry . . . such as healthcare services and pharmaceutical and food supply . . . have a special responsibility to maintain [their] normal work schedule" and "should follow" guidance from the Centers for Disease Control (CDC) "to protect [their] health at work." A few days later, CISA issued guidance to assist "State, Local, and industry partners in identifying" critical infrastructure workers during the COVID-19 response, which included a list of dozens of suggested critical infrastructure workers within numerous sectors. The memorandum accompanying the guidance stated that CISA "recognize[d] that State, local, tribal, and territorial governments are ultimately in charge of implementing and executing response activities in communities under their jurisdiction, while the Federal Government is in a supporting role." In one bolded passage, the memorandum emphasized that the list of critical infrastructure employees was "advisory in nature" and was "not, nor should it be considered to be, a federal directive or standard in and of itself." Elsewhere, the memorandum explained that "State and local officials should use their own judgment in . . . issuing implementation directives and guidance" and that "critical infrastructure industry partners will use their own judgment, informed by this list, to ensure continued operations."

In March and early April, there were signs that the federal government was contemplating more direct control over certain critical industries, including through the Defense Production Act (DPA), 50 U.S.C. § 4511.[3] At a March 18 press briefing,

_____

[3]The DPA authorizes the President to direct private companies to prioritize federal contracts in exigent circumstances. Specifically, the President can "require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a). The President can also "require acceptance and performance of such contracts . . . by any person he finds to be capable," and may "allocate materials, services, and

-6-

President Trump forecasted, "We'll be invoking the Defense Production Act, just in case we need it." Notably, however, the President did not mention the food industry, meat processing, or Tyson in his comments about the DPA. Six days later, President Trump tweeted, "The Defense Production Act is in full force, but haven't had to use it because no one has said NO! Millions of masks coming as back up to States." Again, the tweet said nothing about the food or meat-processing industry.

In late April and early May 2020, however, federal officials explicitly invoked the DPA in the context of the meat-processing industry. On April 28, President Trump signed Executive Order 13917, which declared that "meat and poultry in the food supply chain [met] the criteria specified" in § 4511(b) of the DPA, meaning they constituted "critical and strategic materials." Exec. Order No. 13917, 85 Fed. Reg. 26,313, 26,313 (Apr. 28, 2020). The order underscored the importance of the continued operation of meat and poultry processors and explained that COVID-19 outbreaks at meat-processing facilities and recent state action that reduced or halted production at such facilities had "undermin[ed] critical infrastructure during the national emergency." Id. The President directed the Secretary of Agriculture to "take all appropriate action under [the DPA] to ensure that meat and poultry processors continue operations consistent with the guidance" from the CDC and the Occupational Safety and Health Administration (OSHA). Id. And the President authorized the Secretary to use the means provided by the DPA "to determine the proper nationwide priorities and allocation of all the materials, services, and facilities necessary to ensure the continued supply of meat and poultry, consistent with [federal] guidance for the operations of meat and poultry processing facilities," and

---

facilities in such manner . . . as he shall deem necessary or appropriate to promote the national defense." Id. In order to exercise DPA authority to control the distribution of any material, the President must first find, "(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material." Id. § 4511(b).

to "issue such orders and adopt and revise appropriate rules and regulations as may be necessary to implement this order." Id. at 26,314.

On the same day that the President signed Executive Order 13917, the USDA issued a statement that underscored the importance of meat and poultry facilities and of maintaining the health and safety of employees "to ensure that these critical facilities can continue operating." Citing the Executive Order and the "authority of the [DPA]," the USDA stated that it would "work with meat processing to affirm they will operate in accordance with the CDC and OSHA guidance, and then work with state and local officials to ensure that these plants are allowed to operate to produce the meat protein that Americans need." Finally, on May 5, the Secretary of Agriculture sent letters to state governors and executives of meat-processing companies. The Secretary explained that he was "direct[ing] meat and poultry processors to utilize the guidance issued . . . by CDC and OSHA . . . to implement practices and protocols for staying operational or resuming operations while safeguarding the health and safety of the workers and the community." The Secretary also directed facilities that were currently closed without a timetable for near-term reopening to submit to the USDA written documentation of their protocols and resume operations as soon as they were able to implement the CDC and OSHA guidance. The Secretary reaffirmed that the USDA would "continue to work with State and local officials to ensure that facilities are implementing best practices" and stated that further action under the DPA was "under consideration and [would] be taken if necessary." There is no evidence in the record that further action was taken.

B. Tyson's Response to COVID-19

On March 13, 2020, in response to the COVID-19 pandemic, Tyson suspended its commercial business travel, forbade non-essential visitors from entering Tyson facilities, and required non-critical corporate employees to begin working remotely.

On April 6, 2020, Tyson temporarily suspended operations at its facility in Columbus Junction, Iowa, after more than two dozen employees tested positive for the virus.

Tyson's Waterloo facility also experienced a significant COVID-19 outbreak in March and April of 2020. Plaintiffs allege that by late March or early April, Tyson's executives and supervisors were aware that the coronavirus was spreading through the Waterloo facility, that they did not provide workers with sufficient face coverings or other protective equipment, and that they did not implement or enforce sufficient social distancing measures. Plaintiffs further allege that Tyson transferred workers from the Columbus Junction facility to the Waterloo facility without adequately testing or quarantining them and permitted or encouraged sick employees known or suspected to have been exposed to the coronavirus to continue working at the Waterloo facility. Supervisors and managers allegedly denied the existence of confirmed cases at the facility and reportedly told employees that their sick co-workers had the flu.

Local county officials, who visited the Waterloo facility in April, allegedly lobbied Tyson to close the plant and sent a letter to Tyson imploring it to implement better safety precautions or temporarily cease operations. Tyson resisted initially, but on April 20, 2020, it began shutting down operations at the Waterloo facility. The facility was fully shut down from April 22, 2020, until May 7, 2020. Ultimately, the Black Hawk County Health Department reported more than 1,000 COVID-19 infections among Tyson's 2,800 Waterloo employees. In this case, Plaintiffs allege that their relatives contracted COVID-19 at the Waterloo facility before April 22 and that they subsequently passed away from complications of COVID-19 on April 18, April 23, April 26, and May 25, 2020.

## II. Procedural History

Plaintiffs filed two separate cases in state court, both suits asserting claims for fraudulent misrepresentation and gross negligence against Tyson. Plaintiffs contend that Tyson's tortious actions in March and April of 2020 caused their relatives to contract COVID-19 and subsequently pass away from the illness. Tyson removed both cases to federal court. In the notices of removal, Tyson asserted that the actions challenged by Plaintiffs were taken at the direction of a federal officer and that it has a colorable federal defense against the claims, citing the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Tyson also contended that the Plaintiffs' claims raised substantial and disputed issues of federal law under the DPA which must be decided by a federal forum, citing 28 U.S.C. § 1331.

The district court granted the Plaintiffs' motions to remand both cases. The court found that Tyson had failed to satisfy the elements for removal under the federal officer removal statute and that the Plaintiffs' petitions did not assert federal claims—which would give rise to federal question jurisdiction—but instead stated state-law tort claims. Tyson appeals both decisions.

We review a district court's grant of a motion to remand—and related questions of statutory interpretation—de novo. Graves v. 3M Co., 17 F.4th 764, 767 (8th Cir. 2021); Dahl v. R.J. Reynolds Tobacco Co., 478 F.3d 965, 968 (8th Cir. 2007).

## III. Federal Officer Removal

The federal officer removal statute "grants independent jurisdictional grounds over cases involving federal officers where a district court otherwise would not have jurisdiction." Jacks v. Meridian Res. Co., LLC, 701 F.3d 1224, 1230 (8th Cir. 2012) (quoting Johnson v. Showers, 747 F.2d 1228, 1229 (8th Cir. 1984)). The statute

authorizes removal of any civil action commenced in state court that is brought against an "officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1) (emphasis added). This is an exception to the "well-pleaded complaint rule, under which (absent diversity) a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law." Graves, 17 F.4th at 768 (quoting Kircher v. Putnam Funds Tr., 547 U.S. 633, 644 n.12 (2006)). The federal officer removal statute is to be "liberally construed," and thus the typical presumption against removal does not apply. See Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 250–51 (4th Cir. 2021) (quotation omitted); see also Arizona v. Manypenny, 451 U.S. 232, 242 (1981).

When the removing party is not itself a federal officer or agency, it may remove a case only if it shows that it was "acting under" a federal officer or agency in carrying out the acts that underlie the plaintiff's complaint. Watson v. Philip Morris Cos., 551 U.S. 142, 147 (2007). Here, this threshold showing requires Tyson to establish that (1) it acted under the direction of a federal officer, (2) there is a causal connection between Tyson's actions and the official authority, (3) Tyson has a colorable federal defense to the plaintiffs' claims, and (4) Tyson is a "person," within the meaning of the statute. Jacks, 701 F.3d at 1230.

We begin with the first element. Although "not limitless, the words 'acting under' are broad." Jacks, 701 F.3d at 1230 (cleaned up) (quoting Watson, 551 U.S. at 147). Still, not all relationships between private entities and the federal government satisfy this element. Instead, "[t]he assistance that private contractors provide federal officers [must go] beyond simple compliance with the law and help[] officers fulfill other basic governmental tasks." Watson, 551 U.S. at 153. The private entity's "actions 'must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior,'" Jacks, 701 F.3d at 1230 (quoting Watson, 551 U.S. at

-11-

152), and this relationship "typically involves subjection, guidance, or control," Watson, 551 U.S. at 151 (quotation omitted).

The fact that an entity—such as a meat processor—is subject to pervasive federal regulation alone is not sufficient to confer federal jurisdiction. This is so because "[a] private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" Watson, 551 U.S. at 153; see also Jacks, 701 F.3d at 1230 ("It is not enough that a private person or entity merely operate in an area directed, supervised and monitored by a federal regulatory agency or other such federal entity."). Instead, the private entity must help federal officers fulfill "basic governmental tasks." Watson, 551 U.S. at 153–54; see also Graves, 17 F.4th at 769; Jacks, 701 F.3d at 1231 ("Taxpayers who fill out complex federal tax forms, or airline passengers who obey federal regulations prohibiting smoking certainly 'help' or 'assist' the federal law enforcement authorities in some sense of those words, but these individuals do not 'act under' an agency or officer of the federal government for purposes of removal under the statute.").

For this element, "[t]he paradigm is a private person acting under the direction of a federal law enforcement officer." Fidelitad, Inc. v. Insitu, Inc., 904 F.3d 1095, 1099 (9th Cir. 2018) (citing Watson, 551 U.S. at 149); see, e.g., Maryland v. Soper, 270 U.S. 9, 30 (1926) (explaining that a private party acting as federal officers' driver in a distillery raid had "the same right to the benefit of" the removal provision as did the federal agents). Courts have also found this element satisfied where a private contractor provided the government with a product that it needed or performed a job that the government would otherwise have to perform. In Jacks, for example, we explained that a health insurance provider that provided insurance to federal employees was acting under the direction of a federal officer because the federal government had enlisted it to "help the government fulfill the basic task of

establishing a health benefits program for federal employees"—a task that was imposed on the government by statute. 701 F.3d at 1233; see also In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila., 790 F.3d 457, 469 (3d Cir. 2015) (explaining that a nonprofit community defender acts under a federal officer by representing indigent federal defendants in part because it is delegated authority from the federal government and provides a service that the federal government would otherwise have to provide itself); Isaacson v. Dow Chem. Co., 517 F.3d 129, 136–37 (2d Cir. 2008) (finding "acting under" element satisfied where defendant chemical companies contracted with the federal government to provide a product—Agent Orange—that the government otherwise "would have had to produce itself").

Tyson argues that from the earliest days of the pandemic, the federal government enlisted it to fulfill a basic governmental task—ensuring that the national food supply would not be interrupted—and thus Tyson was acting under federal direction while operating its Waterloo facility in March and April 2020. And Tyson contends that the various communications from federal officials—described above—constituted federal directives intended to effectuate this goal. The record, however, tells a different story.

For one, Tyson conflates the federal government's designation of the "food and agriculture" sector as critical infrastructure with a finding that Tyson was fulfilling a basic governmental task. In arguing that its work constituted such a task, Tyson cites a 2013 Presidential Policy Directive, which identified sixteen critical infrastructure sectors (including food and agriculture), delegated regulatory authority over those sectors to specific agencies, and stated that critical infrastructure security and resilience are shared responsibilities among various private entities and the federal government. See Presidential Policy Directive/PPD-21, Critical Infrastructure Security and Resilience (Feb. 12, 2013). Tyson points out that the federal

government invoked this critical infrastructure framework to respond to the COVID-19 pandemic in March and April 2020.  Relevant here, the President's Coronavirus Guidelines described the "special responsibility" of critical infrastructure workers to maintain normal schedules, and CISA included "meat processing" employees on the list of suggested critical infrastructure workers that it sent to state and local officials.

But the fact that an industry is considered critical does not necessarily mean that every entity within it fulfills a basic governmental task or that workers within that industry are acting under the direction of federal officers.  The 2013 list included sectors as broad as "Commercial Facilities," "Financial Services," and "Healthcare."  The March 2020 CISA list identified scores of categories of workers, including dentists, automotive repair workers, news reporters, and funeral home workers.  Although important, these professions do not typically undertake work that would otherwise fall to the federal government.  And, similarly, while the federal government may have an interest in ensuring a stable food supply, it is not typically the "dut[y]" or "task[]" of the federal government to process meat for commercial consumption.  See Jacks, 701 F.3d at 1230 (quoting Watson, 551 U.S. at 152).  It cannot be that the federal government's mere designation of an industry as important—or even critical—is sufficient to federalize an entity's operations and confer federal jurisdiction.[4]  See Maglioli v. All. HC Holdings LLC, 16 F.4th 393, 406 (3d Cir. 2021) (holding that the CISA designation of nursing homes as critical

_____

[4]Even Tyson seems to acknowledge that its designation as "critical infrastructure" meant that the federal government provided *it* assistance, rather than the other way around.  For example, CISA and the USDA helped procure PPE for Tyson, and other federal agencies provided meat-processing employees with authorization to continue working despite restrictions. But "[g]overnment advice and assistance" are not enough to "establish the 'acting under' relationship that § 1442(a)(1) requires." Graves, 17 F.4th at 770 (explaining that earplug manufacturer was not "acting under" a federal officer where it sought input from a U.S. Army audiologist and incorporated that feedback).

-14-

infrastructure in a subsequent version of list was not sufficient for the "acting under" element because "Congress did not deputize all of these private-sector workers as federal officers").

Tyson's reliance on various communications from federal officials and federal agencies is likewise unavailing. No statement issued or action taken before Tyson shut down its Waterloo facility on April 22—and before Plaintiffs' relatives contracted COVID-19—constituted a federal directive that subjected Tyson to the guidance and control of the federal government or enlisted Tyson to undertake a governmental task. The March 15 conference call with President Trump served to reassure the country that the food-processing and retail sectors intended to remain open and that the federal government was monitoring the food supply. Other statements by the President and Vice President only underscored the importance of the food and agriculture industry. And the USDA's March 16 statement reaffirmed that the Department remained committed to working closely with those in the food and agriculture industry and emphasized that ongoing communication would be necessary. At most, these statements indicate that the federal government was encouraging Tyson—and other industries—to continue to operate normally. But they did not direct or enlist Tyson to fulfill a government function or even tell Tyson specifically what to do.[5] See Mays v. City of Flint, 871 F.3d 437, 446–47 (6th Cir. 2017) (communications between state and federal agencies during Flint water crisis—without a federal order to take any specific action—could not satisfy the "acting under" element). And despite this federal encouragement to remain open,

_____

[5]At oral argument, Tyson acknowledged that it was not subject to a federal "mandate" to remain open, but it asserted that the "acting under" element is satisfied because it was "affirmatively encouraged" to stay open and operational. Even if we were to accept that "encouragement" is sufficient, Tyson still fails to explain convincingly how its efforts to stay open constituted "effort[s] to *assist*, or to help *carry out*, the duties or tasks of the federal superior." See Jacks, 701 F.3d at 1230 (quoting Watson, 551 U.S. at 152).

Tyson itself shut down multiple plants in April—including the Waterloo facility—which indicates that it retained complete, independent discretion over the continuity of its operations.

Further, Tyson's argument that it was subject to directives arising from President Trump's invocation of the DPA fails for different reasons. First, neither of the statements cited by Tyson—the President's March 18 remarks and March 24 tweet—mention meat-processing or food supply. Both, in context, clearly related to the production and distribution of masks and ventilators. Second, according to the record before us, the first time the President mentioned the DPA in the context of meat and poultry processing was in Executive Order 13917, which was issued on April 28, 2020, after Tyson had already shut down the Waterloo facility and after Plaintiffs' relatives had contracted COVID-19. In fact, by that point, three of the four relatives had already died.

Nonetheless, recognizing this timing issue, Tyson attempts to portray Executive Order 13917 as the "formalization" of prior federal action rather than the "commencement" of some new directive. In this vein, Tyson asserts that the federal officer removal statute does not demand formality and that the Executive Order confirms that Tyson was operating under federal direction from the earliest days of the pandemic, even if those early federal actions were informal in nature. But that misses the point. Tyson's argument that it was "acting under" federal officers is untenable not because the federal actions early in the pandemic were informal, but rather because they contained no such directive. Those federal actions embraced a cooperative approach, continued to recognize the authority of state and local officials, and merely encouraged various industries to maintain operations as much as possible

-16-

while heeding health and safety guidance. If Executive Order 13917 contained a sufficient directive,[6] it marked a departure rather than a continuance of prior practice.

In sum, Tyson has failed to show that it was performing a basic governmental task or operating pursuant to a federal directive in March and April of 2020. We thus conclude that Tyson was not "acting under" a federal officer at the time that Plaintiffs' relatives contracted COVID-19 and is therefore not eligible for removal under the federal officer removal statute. Given that conclusion, we need not reach the remaining elements of the statute.

## IV. Federal Question

In both notices of removal, Tyson also argued that the Plaintiffs' petitions "raise[] substantial and disputed issues of federal law under the Defense Production Act that must be decided by a federal forum." The district court disagreed. When Tyson submitted its briefing to us, our precedent foreclosed our review of this alternative ground for removal. See Jacks, 701 F.3d at 1229 (holding we only had

---

[6]We question whether Executive Order 13917 itself would constitute a directive that could support federal jurisdiction. That order simply took the preliminary step of finding that the meat and poultry supply chain met the criteria under the DPA and delegated authority to the USDA to take appropriate action under the Act. The order did not take the next step under the DPA of "requir[ing] that performance under contracts or orders . . . take priority over performance" of other contracts or "requir[ing] acceptance and performance of such contracts." See 50 U.S.C. § 4511(a). After the President signed Executive Order 13917, the USDA expressed its support for the continued operation of meat and poultry facilities and directed facilities that were closed to submit documentation of their protocols and reopen as soon as they could comply with CDC and OSHA guidance. But we find no evidence in the record that the USDA exercised its DPA authority to enter into any contracts or order Tyson to prioritize production for the federal government over other obligations.

jurisdiction to review district court's § 1442(a)(1) ruling, as our § 1447(d) jurisprudence precluded a broader review of the district court's remand decision). However, after briefing in this case was complete, the Supreme Court abrogated that precedent in BP P.L.C. v. Mayor and City Council of Baltimore, holding that "when a district court's removal order rejects all of the defendants' grounds for removal, § 1447(d) authorizes a court of appeals to review each and every one of them." 141 S. Ct. 1532, 1538 (2021); see also id. at 1542 ("Suppose a court of appeals finds the § 1442 or § 1443 issue a difficult and close one, but believes removal is clearly and easily warranted on another basis. Allowing the court to address that easier question and avoid harder ones may facilitate a prompter resolution of the proceeding for all involved.").

Pursuant to BP, we have jurisdiction to review the appeal of the district court's rejection of Tyson's federal question basis for removal. Nevertheless, we conclude that Tyson has abandoned any such argument. In a footnote in its opening brief, Tyson simply stated that "Appellants reserve the right to raise those arguments [about federal question jurisdiction] should the Supreme Court abrogate that precedent" from Jacks. Tyson then made no argument in its opening brief or reply brief about federal question jurisdiction, despite the fact that Plaintiffs suggested in their response that the court should deem the argument waived. Nor did Tyson file any notice of supplemental authority or raise the issue at oral argument. We thus deem this argument abandoned and do not address it. See Rotskoff v. Cooley, 438 F.3d 852, 854–55 (8th Cir. 2006) (deeming argument not developed in briefs to be waived); United States v. Zavala, 427 F.3d 562, 564 n.1 (8th Cir. 2005); see also Fed. R. App. P. 28(a)(8)(A) (explaining that an appellant's brief must contain appellant's arguments "and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

## IV.

For the foregoing reasons, we affirm the district court's orders remanding these cases to state court.

_____