# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 23-1107

———————————————

John Doe, I, et al.

*Plaintiffs - Appellees*

v.

BJC Health System, doing business as BJC Healthcare

*Defendant - Appellant*

————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

————————

Submitted: September 20, 2023
Filed: December 28, 2023

————————

Before SMITH, Chief Judge, MELLOY and ERICKSON, Circuit Judges.

————————

SMITH, Chief Judge.

Plaintiffs brought this putative class action against BJC Health System (BJC) in Missouri state court. They claim that, when they visited BJC's online patient portal to access electronic health records (EHRs), BJC shared their protected health information (PHI) with third-party marketing services in violation of Missouri law.

After being sued in state court, BJC invoked the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and removed this case to federal court. BJC argues

that it is eligible for federal officer removal because, when it created and operated its online patient portal, it acted under the United States Department of Health and Human Services (HHS). The district court[1] rejected this argument and ordered remand of this case to Missouri state court. BJC appeals the remand order. For the reasons set forth in this opinion, we affirm.

I. *Background*

In 2009, Congress enacted the Health Information Technology for Economic and Clinical Health (HITECH) Act. The Act established an Office of the National Coordinator for Health Information Technology (Coordinator) within HHS. 42 U.S.C. § 300jj-11(a). The Act tasked the Coordinator "with the development of a nationwide health information technology infrastructure that allows for the electronic use and exchange of information." *Id.* § 300jj-11(b). As described by Congress, the Act aims to strengthen security of PHI, improve health outcomes, reduce medical errors, lower costs, and facilitate greater coordination among providers. *Id.*; *see generally* Kalle Deyette, Comment, *HITECH Act: Building an Infrastructure for Health Information Organizations and A New Health Care Delivery System*, 8 St. Louis U.J. Health L. & Pol'y 375 (2015) (describing the Act's health information technology goals).

Relevant here, the Act authorizes HHS to make "incentive payments" to healthcare providers for their "adoption and meaningful use of certified EHR technology." 42 U.S.C. §§ 1395w-4(o), 1395ww(n); *see also* 42 C.F.R. §§ 495.2–.370. These payments have been called the EHR Incentive Program, the Meaningful Use Program, and the Promoting Interoperability Program. *See, e.g.*, *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 409 (6th Cir. 2016); Joseph D. Szerejko, Note, *Reading Between the Lines of Electronic Health Records: The Health Information Technology for Economic and Clinical Health Act and Its Implications for Health Care Fraud and Information Security*, 47 Conn. L. Rev.

---

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

1103, 1108 (2015); *Doe, I v. BJC Health Sys.*, No. 4:22-cv-919-RWS, 2023 WL 369427, at \*2 (E.D. Mo. Jan. 10, 2023).

In 2013, BJC created an online portal for its patients. The portal was initially called MyBJCHealth and renamed MyChart in 2017. The portal allows BJC patients to go online and access EHRs, such as medical test results, and communicate with BJC personnel, such as physicians and nurses. HHS gave BJC incentive payments for creating and operating this portal.

In 2022, plaintiffs filed this putative class action against BJC in Missouri state court. They are or were BJC patients who claim that BJC violated their medical privacy rights under Missouri law. Specifically, plaintiffs allege that, when patients visited MyBJCHealth or MyChart, the portal shared their PHI with third-party services, including Alphabet (Google) and Meta Platforms (Facebook), which used the information for targeted online advertising. BJC acknowledges that its portal shared information with third parties, but it describes the information as depersonalized and unprotected "metadata." The nature of the information is not pertinent in this appeal.

BJC timely removed this case from state court to federal court under the federal officer removal statute. 28 U.S.C. § 1442(a)(1). In the district court, BJC argued that, when it created and operated the portal, it acted under HHS's or the Coordinator's authority. Plaintiffs moved for remand to state court, and the district court granted their motion. BJC now appeals the remand order.

## II. *Discussion*

We have jurisdiction under 28 U.S.C. § 1447(d). "We review a district court's grant of a motion to remand—and related questions of statutory interpretation—de novo." *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021).

This case focuses on the federal officer removal statute. 28 U.S.C. § 1442(a). The statute provides the federal government, federal agencies, federal officers, and persons "acting under" federal officers the right to remove from state court to federal

court certain civil actions and criminal prosecutions brought against them. *Id.* The statute is "an incident of federal supremacy." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969); *see* U.S. Const. art. VI, cl. 2 (Supremacy Clause). Its principal purpose is to afford the designated classes of defendants "the protection of a federal forum" when they incur or potentially incur liability under state law for performing "their duty to enforce federal law." *Willingham*, 395 U.S. at 407. The statute is "an exception to the well-pleaded complaint rule." *Buljic*, 22 F.4th at 738 (internal quotation marks omitted). It should be "liberally construed, and thus the typical presumption against removal does not apply." *Id.* (internal quotation marks omitted).

"When the removing party is not itself a federal officer or agency," it must make a "threshold showing" that (1) it is a "person" under the statute, (2) it "acted under the direction of a federal officer," (3) a "causal connection" exists between its complained-of conduct and official federal authority, and (4) it has a "colorable federal defense" to the claim or claims against it. *Id.*; *see also Cagle v. NHC Healthcare-Md. Heights, LLC*, 78 F.4th 1061, 1068 (8th Cir. 2023); *Minnesota v. Am. Petroleum Inst.*, 63 F.4th 703, 714 (8th Cir. 2023); *Graves v. 3M Co.*, 17 F.4th 764, 768–69 (8th Cir. 2021); *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012), *abrogated on other grounds by BP P.L.C. v. Mayor & City Council of Balt.*, 141 S. Ct. 1532, 1538 (2021). All four elements must be present. The absence of any element will defeat removal from state to federal court.

It is undisputed that BJC is not itself a federal officer or agency and that BJC is a person under the federal officer removal statute. Instead, this case focuses on whether BJC acted under the direction of HHS or the Coordinator when it created and operated MyBJCHealth or MyChart, accepted federal incentive payments, and potentially incurred liability under Missouri law. This case turns on the meaning of the phrase "acting under" in the statute. *See* 28 U.S.C. § 1442(a)(1) (referring to "any person *acting under* that officer" (emphasis added)).

## A. *Recent Case Law*

Our construction of the statute's "acting under" element begins with *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007). In *Watson*, plaintiffs sued the cigarette

manufacturer Philip Morris in Arkansas state court. They claimed that Philip Morris's branding and marketing of certain cigarettes as "light" were "deceptive and misleading under Arkansas law." *Id.* at 146 (internal quotation marks omitted). Philip Morris removed the case to federal court. It argued that it acted under the Federal Trade Commission (FTC) when it followed government methods and processes, tested cigarettes for their tar and nicotine content, and labeled low-level cigarettes as "light." *Id.* at 146–47, 154–56. The Supreme Court rejected this argument, holding that Philip Morris was a mere private entity. *Id.* at 157.

Importantly, the Court emphasized that the federal officer removal statute is "not limitless." *Id.* at 147. When a court applies the statute, it must consider the "language, context, history, and purposes." *Id.* A business that simply follows federal law, even highly detailed and complex regulations, does not act under a federal officer. *Id.* at 151–53. The "relevant relationship" that must exist "typically involves subjection, guidance, or control." *Id.* at 151 (internal quotation marks omitted). It "must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 152 (emphasis omitted).

According to the Court, Philip Morris's argument for removal failed on the "acting under" element because there was "no evidence of any delegation of legal authority from the FTC." *Id.* at 156. When Philip Morris tested cigarettes for tar and nicotine content, it did not "undertake testing on the Government agency's behalf." *Id.* It acted on its own behalf and for its own business purposes.

In *Jacks*, we addressed a lawsuit between a plaintiff and her health insurer, Blue Cross Blue Shield–Kansas City (BCBS). 701 F.3d 1224. The plaintiff sued BCBS in state court, alleging violations of Missouri law. *Id.* at 1227–28. BCBS removed the case to federal court, observing that it insured the plaintiff through the Federal Employees Health Benefits (FEHB) program. *Id.* We held that removal was proper because, when a health insurer participates in the FEHB program, it "is helping the government to produce an item that it needs—the basic governmental task of providing health benefits for its employees." *Id.* at 1234. The health insurer acts as a sort of middleman. It delivers federal benefits to federal beneficiaries. *See*

*also Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, No. 22-10414, 2023 WL 2573914, at *3–4 (5th Cir. Mar. 20, 2023) (unpublished per curiam) (allowing Medicare Advantage Organizations to remove cases from state court to federal court).

In recent years, we have decided several more cases on federal officer removal. The common analytical thread running through these cases is some basic governmental task. In *Graves*, plaintiffs who had served in civilian and military roles sued 3M for auditory damage they suffered after using 3M earplugs. 17 F.4th at 767. We held that the civilian cases were not removable because 3M did not show that it "was carrying out or assisting in the *government's* duties." *Id.* at 770. However, 3M could remove military cases, where the military obtained the earplugs, "developed its own instructions" for using them, and distributed them to plaintiffs. *Id.* at 770, 773.

In *Buljic*, survivors of meat processing workers who contracted and died from COVID-19, at the beginning of the COVID-19 pandemic, sued the workers' former employer, Tyson Foods (Tyson), for fraudulent misrepresentation and gross negligence. 22 F.4th at 734. Tyson removed the case to federal court. *Id.* Tyson argued that it was "critical infrastructure" and had worked closely with the President and the United States Department of Agriculture to supply essential foods to Americans during the pandemic's early stages. *Id.* at 734–40. We rejected this argument. *Id.* at 742. Although meat processing is critical to the national economy and general welfare, "the fact that an industry is considered critical does not necessarily mean that every entity within it fulfills a basic governmental task or that workers within that industry are acting under the direction of federal officers." *Id.* at 740. "[W]hile the federal government may have an interest in ensuring a stable food supply, it is not typically the duty or task of the federal government to process meat for commercial consumption." *Id.* (cleaned up). Cooperation with and encouragement from the federal government, alone, are insufficient to support federal officer removal. *Id.* at 741; *see also Glenn v. Tyson Foods, Inc.*, 40 F.4th 230, 236 (5th Cir. 2022) ("Packaging and processing poultry has always been a private task—not a governmental one."); *Cagle*, 78 F.4th at 1068 (holding that a

nursing home, notwithstanding its "critical infrastructure" designation, was not entitled to remove a COVID-19 suit from state to federal court).

In *American Petroleum Institute*, the State of Minnesota sued fossil fuel producers in state court, alleging harms to the environment. 63 F.4th at 707–08. The fossil fuel producers removed to federal court, but the district court ordered remand, and we affirmed. *Id.* at 708. Analyzing the "acting under" and "causal connection" elements together, we held that military fuel production, federal offshore leases, and participation in the Strategic Petroleum Reserve did not make the case removable. *Id.* at 714–16 & n.12. Minnesota's suit did not focus on these activities but on how fossil fuel producers "conducted their marketing activities to the general public." *Id.* at 715. A business's interactions with the general public do not normally establish a ground for removal.

From the Supreme Court decision in *Watson* and from our own decisions in *Jacks*, *Graves*, *Buljic*, and *American Petroleum Institute*, we conclude that a party acts under a federal officer, within the meaning of the federal officer removal statute, only when it performs a "basic governmental task[]." *Watson*, 551 U.S. at 153; *Jacks*, 701 F.3d at 1231–32, 1234; *Graves*, 17 F.4th at 769; *Buljic*, 22 F.4th at 738–42. A basic governmental task involves a "delegation of legal authority" from a federal entity. *Watson*, 551 U.S. at 156; *see also Jacks*, 701 F.3d at 1233–34. In other words, the party acts on the government's behalf. *Watson*, 551 U.S. at 156. It performs or helps the government perform federal duties. *Id.* at 152; *Graves*, 17 F.4th at 770. The party does the business of the federal government and not merely its own.[2]

---

[2]The Supreme Court compares the "special relationship" between a federal officer and a subordinate to the relationship between a principal and an agent at common law. *Watson*, 551 U.S. at 156–57; *see* Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."); Restatement (Second)

The classic example of a person who acts under a federal officer is a government contractor. *Watson*, 551 U.S. at 153; *Jacks*, 701 F.3d at 1231–32; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016). Federal courts have often held that parties may invoke the statute and remove cases when they "provided the government with a product that it needed or performed a job that the government would otherwise have to perform." *Buljic*, 22 F.4th at 739; *see also Jacks*, 701 F.3d at 1234. Looking to our sister circuits, parties might also qualify for removal when they functioned in practice as "instrumentalities of the United States." *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 201 (5th Cir. 2019) (quoting *Ala. Power Co. v. Ala. Elec. Coop., Inc.*, 394 F.2d 672, 677 (5th Cir. 1968)); *Cessna v. REA Energy Coop., Inc.*, 753 F. App'x 124, 127 (3d Cir. 2018) (unpublished) (same); *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1143 (11th Cir. 2017) (same).

Under the classic example, the federal government has *explicitly* delegated its authority to a government contractor. Under the latter example of our sister circuits, the federal government has *implicitly* delegated its authority. It has tacitly allowed a private entity "to provide a public function conceived of and directed by the federal government." *Caver*, 845 F.3d at 1144. *But see Watson*, 551 U.S. at 157 ("[N]either Congress nor federal agencies *normally* delegate legal authority to private entities without saying that they are doing so." (emphasis added)).

of Agency § 1(1) (Am. L. Inst. 1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."). In a strict sense, we do not believe parties qualified to remove their cases will always be agents, but their relationships to federal officers will usually bear many of the same hallmarks. *See Watson*, 551 U.S. at 151 ("[T]he word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.' That relationship typically involves 'subjection, guidance, or control.'" (citations omitted)).

B. *Application to MyBJCHealth*

In this case, BJC argues both explicit and implicit delegation. It contends that it exercised explicit or implied authority delegated from HHS or the Coordinator when it created and operated its online patient portal—MyBJCHealth or MyChart. In support of its argument, BJC cites two district courts from outside this circuit. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20-cv-1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). A court of appeals does not ordinarily spend its time parsing the orders of out-of-circuit district courts. *See RLJCS Enters., Inc. v. Pro. Benefit Tr. Multiple Emp. Welfare Benefit Plan & Tr.*, 487 F.3d 494, 499 (7th Cir. 2007). But given BJC's reliance on those two orders, we will briefly address them here.

In *UPMC*, a district court concluded that a healthcare provider could remove a medical privacy suit from state to federal court based on its participation in HHS's incentive program. 2020 WL 4381675, at *7. The court reasoned that, when healthcare providers create and maintain patient portals and accept HHS incentive payments, they assist HHS in building "an interoperable health information technology infrastructure." *Id.* at *5 (internal quotation marks omitted). Their "voluntary participation in implementing a nationwide EHR network shows [a] relationship . . . like the government contractor relationship." *Id.* at *6.

Similarly, in *ProMedica*, a district court concluded that a healthcare provider could remove a medical privacy suit to federal court. 2020 WL 7705627, at *3. The court reasoned that, when healthcare providers participate in the HHS program, they "assist the federal government in its mission for a nationwide system of electronic health records" or help HHS "create a unified system of patient electronic health records," as with "a government-contractor relationship." *Id.* at *2–3.

We find these orders—and BJC's argument based on them—unpersuasive.[3] To show that it acted under a federal officer as a government contractor, a party seeking removal must have "provided the government with a product that it needed or performed a job that the government would otherwise have to perform." *Buljic*, 22 F.4th at 739; *see also Watson*, 551 U.S. at 154 ("[A party] at least arguably . . . performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform."). Parties who act as government middlemen and deliver federal benefits to federal beneficiaries will usually be able to make this showing. *See, e.g.*, *Jacks*, 701 F.3d at 1234 (FEHB); *Trinity*, 2023 WL 2573914, at *4 (Medicare Advantage). Parties "merely doing business in a highly regulated arena" will not, even if they accept government subsidies. *See Jacks*, 701 F.3d at 1234. "[T]he receipt of federal funding alone cannot establish a delegation of legal authority . . . ." *Mays v. City of Flint*, 871 F.3d 437, 444 (6th Cir. 2017).

The line between a party who acts as a government middleman and a party who accepts federal funding for its own business purposes may sometimes be blurry. Wherever the line may lie, BJC clearly sits on the private side. MyBJCHealth or MyChart was not a federal government website, it was not a website BJC operated on the federal government's behalf or for the federal government's benefit, and it was not a website the federal government directed BJC to create or operate. The design of private websites is not—and has never been—a basic *governmental* task. When BJC created and operated an online portal for its patients, it was not doing the federal government's business. It was doing its own.

This case resembles *Buljic* and *American Petroleum Institute*. In *Buljic*, a meat processor argued that it qualified for federal officer removal because it was "critical infrastructure" in the nation's food system. We rejected that argument. *See Buljic*, 22 F.4th at 739 ("Tyson conflates the federal government's designation of the 'food and agriculture' sector as critical infrastructure with a finding that Tyson was

---

[3]Likewise, we have reviewed, but do not base our decision on, the contrary district court orders that plaintiffs have compiled. *See RLJCS*, 487 F.3d at 499.

fulfilling a basic governmental task."). And in *American Petroleum Institute*, fossil fuel producers argued that they qualified for federal officer removal because of their "production of military-grade fuel, operation of federal oil leases, and participation in strategic energy infrastructure." 63 F.4th at 715. We rejected that argument as well. *Id.* at 716 & n.12. Here, the argument that BJC participates in a nationwide health records system—or an HHS effort to build a nationwide health records system—is also unconvincing. "[BJC] conflates the federal government's designation of [EHR technology as important] with a finding that [BJC] was fulfilling a basic governmental task." *Buljic*, 22 F.4th at 739. It was not.

Meat processors, fossil fuel producers, and healthcare providers all engage in business activities that are important and in which the federal government and the public are deeply interested, but this importance and interest do not bring any of them within the scope of the federal officer removal statute. 28 U.S.C. § 1442(a)(1). Parties must show that the federal government delegated its own duties to them— duties that are essentially governmental. *See Watson*, 551 U.S. at 152 ("[P]recedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." (emphasis omitted)); *id.* at 153 ("The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks."). BJC showed that HHS endorses online patient portals, and HHS has provided subsidies for them. BJC has not shown that it performed a basic task or duty of the federal government.

This case is readily distinguishable from *Jacks* and *Graves*. In *Jacks*, we allowed a health insurer that participated in the FEHB program to remove a case to federal court. 701 F.3d 1224. The FEHB program provides health insurance to federal employees and their families, and we recognized that health insurance is an item *the government needs* "so as to compete for the best talent along with private companies." *Id.* at 1232–34. And in *Graves*, we allowed some cases to be removed— and not others—based on whether plaintiffs had received their earplugs through the military or the private sector. 17 F.4th at 770, 773. Here, BJC was not supplying the federal civilian workforce or the military with a necessary item, such as health

insurance or earplugs. BJC's portal was a private website. It was a way for patients and BJC personnel to access EHRs and communicate with one another. Apart from being subsidized by HHS, the portal had nothing to do with the federal government's operations or duties. *See Mays*, 871 F.3d at 444.

For similar reasons, we reject the view that MyBJCHealth or MyChart was an instance of implied delegated authority. This circuit has not adopted the view of the Third, Fifth, and Eleventh Circuits that an implied delegation can establish a basis for federal officer removal. But even if we accepted this theory today, we do not believe BJC would qualify. Our sister circuits have emphasized that an implied delegation exists when a private party functions in practice as an "instrumentalit[y] of the United States." *Butler*, 926 F.3d at 201; *Cessna*, 753 F. App'x at 127; *Caver*, 845 F.3d at 1143.[4] Here, there is no indication that BJC practically functioned as a federal instrumentality or that its patients ever believed they were dealing with an entity acting in place of the federal government. The creation and operation of an online patient portal is not "a public function" that the federal government tacitly allowed BJC to perform on its behalf. *Caver*, 845 F.3d at 1144. MyBJCHealth or MyChart was simply a private website, whose existence has served (or perhaps violated) the interests of BJC, its personnel, and its patients.

In sum, the creation and operation of an online patient portal is not a basic governmental task. When BJC created and operated MyBJCHealth or MyChart, it did not act pursuant to an explicit or implied "delegation of legal authority" from HHS, the Coordinator, or any other federal officer. *Watson*, 551 U.S. at 156. BJC

---

[4]*Cf.* Restatement (Third) of Agency § 2.03 (Am. L. Inst. 2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."); Restatement (Second) of Agency § 8 (Am. L. Inst. 1958) ("Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.").

was not a government contractor, and it did not function in practice as a federal instrumentality. It made a private website and received a federal subsidy. This is insufficient for removing a case under 28 U.S.C. § 1442(a)(1).

## C. *Remaining Elements*

Because BJC did not act under a federal officer when it created and operated its online patient portal and accepted HHS incentive payments, we need not address the causal connection and colorable federal defense elements. *See Buljic*, 22 F.4th at 742 ("[W]e need not reach the remaining elements of the statute.").

## III. *Conclusion*

We affirm the order remanding this case to Missouri state court.

_____