# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 7, 2022

Lyle W. Cayce
Clerk

No. 21-40622

ROLANDETTE GLENN; IDELL BELL; KERRY CARTWRIGHT; TAMMY FLETCHER; LAVEKA JENKINS; KIESHA JOHNSON; RONALD JOHNSON; DAISY WILLIAMS; DANICA WILSON; JOHN WYATT; CRYSTAL WYATT; CLIFFORD BELL, *Individually and as Personal Representative of* THE ESTATE OF BEVERLY WHITSEY,

*Plaintiffs—Appellees*,

*versus*

TYSON FOODS, INCORPORATED; JASON ORSAK; ERICA ANTHONY; MARIA CRUZ,

*Defendants—Appellants*,

CONSOLIDATED WITH

No. 21-11110

MARIA YOLANDA CHAVEZ, *Individually and on behalf of Minor* LC *and* ESTATE OF JOSE ANGEL CHAVEZ; ANGEL CHAVEZ; RITA ELAINE COWAN, *Individually and on behalf of* THE ESTATE OF THOMAS DAVID COWAN,

*Plaintiffs—Appellees*,

No. 21-40622
c/w No. 21-11110

*versus*

TYSON FOODS, INCORPORATED, *doing business as* TYSON FOODS;
TYSON FRESH MEATS, INCORPORATED,

*Defendants—Appellants*.

---

Appeals from United States District Courts
for the Eastern and Northern Districts of Texas
USDC Nos. 20-CV-184, 21-CV-1184

---

Before WILLETT, ENGELHARDT, and WILSON, *Circuit Judges*.

DON R. WILLETT, *Circuit Judge*:

Congress enacted the first "federal officer removal statute" during the War of 1812 to protect U.S. customs officials.[1] New England states were generally opposed to the war, and shipowners from the region took to suing federal agents charged with enforcing the trade embargo against England.[2] Congress responded by giving customs officials the right to remove state-court actions brought against them to federal court.[3] Since that time Congress has given the right of removal to more and more federal officers. Today all federal officers as well as "any person acting under that officer" are eligible.[4] While the scope of federal officer removal has broadened, its purpose

---

[1] *See* Elizabeth M. Johnson, *Removal of Suits Against Federal Officers: Does the Malfeasant Mailman Merit a Federal Forum?*, 88 COLUM. L. REV. 1098, 1099 (1988); *see also Watson v. Philip Morris Cos.*, 551 U.S. 142, 147–49 (2007) (discussing the history of the federal officer removal statute).

[2] *Watson*, 551 U.S. at 147–49.

[3] *Id.*

[4] 28 U.S.C. § 1442(a)(1).

No. 21-40622
c/w No. 21-11110

remains the same: to give those who carry out federal policy a more favorable forum than they might find in state court.[5]

In this case, we must decide whether Tyson Foods, Inc. was "acting under" direction from the federal government when it chose to keep its poultry processing plants open during the early months of the COVID-19 pandemic. Tyson argues that it was, and that the district courts erred in remanding these cases back to state court. But the record simply does not bear out Tyson's theory. Tyson received, at most, strong encouragement from the federal government. But Tyson was never told that it *must* keep its facilities open. Try as it might, Tyson cannot transmogrify suggestion and concern into direction and control. We AFFIRM the district courts' orders remanding these cases to state court.

I

A

When the COVID-19 pandemic began, the federal government fretted that the nation's food supply might be at risk. The same week that President Trump declared a national emergency, he and other federal officials held calls with state officials and business executives to exchange information and discuss strategies. Dozens of businesses participated in these calls, including representatives from Tyson, Whole Foods, Target, General Mills, Costco, and Walmart.[6] During these calls, the federal government exhorted companies designated as "critical infrastructure" to keep operating

---

[5] *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2020) (en banc) ("Congress authorized . . . federal officials . . . to seek a federal forum rather than face possibly prejudicial resolution of disputes in state courts.").

[6] *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, THE WHITE HOUSE: TRUMP WHITE HOUSE ARCHIVES (Mar. 15, 2020), https://bit.ly/3FesI8H.

No. 21-40622
c/w No. 21-11110

even as many other companies sent their employees home.[7] The federal government also issued guidance encouraging employees in critical infrastructure industries to keep working, and for everyone else to work from home if possible and to avoid discretionary travel.

This federal guidance was not binding. But the State of Texas apparently agreed with the federal government's preference that companies like Tyson should continue operating. With encouragement from Governor Abbott and federal officials, Tyson printed out "Essential Employee Verification" letters for its employees to show local law enforcement if stopped, demonstrating that they were allowed to go to work.

Meat and poultry processing was not the only industry designated as "critical infrastructure." Everything from banks and auto-repair shops to hotels and dentists received the same designation. But the federal government's coordination with the meatpacking industry was especially close. Employees of the Food Safety and Inspection Service (FSIS), a subsidiary of the United States Department of Agriculture (USDA), have long been tasked with inspecting meatpacking operations. These inspections are designed to ensure compliance with myriad federal laws and regulations including the Federal Meat Inspection Act (FMIA)[8] and the Poultry Products Inspection Act (PPIA).[9] FSIS inspections became more complicated during the pandemic because they had to be completed in person, often in close contact with Tyson employees. Tyson and the federal government negotiated a detailed set of protocols designed to allow

---

[7] Matt Noltemeyer, *Trump Meets with Food Company Leaders*, Food Bus. News (Mar. 16, 2020), https://bit.ly/3t2fiXQ.

[8] 21 U.S.C. § 603 *et seq.*

[9] *Id.* § 451 *et seq.*

inspections to continue, while ensuring the safety of FSIS and Tyson employees. The federal government also promised that it would try to procure protective equipment (like face masks and gloves) for Tyson.

President Trump and other federal officers issued public comments encouraging critical industries to keep operating and for their employees to go to work. The President tweeted that the "Defense Production Act is in full force, but [we] haven't had to use it because no one has said NO!"[10] Vice President Pence likewise encouraged food industry workers: "show up and do your job."[11]

The federal government's most overt act to keep meat and poultry processing plants open was Executive Order 13917.[12] That order delegated authority to the Secretary of Agriculture to "take all appropriate action" under Section 101 of the Defense Production Act (DPA) "to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA."[13] The USDA used this delegated authority to issue two letters, one to state governments and one to businesses. The letter to businesses said that "meat and poultry processing plants" "should utilize" guidance from the CDC

---

[10] *See* Doina Chiacu, *Trump Administration Unclear over Emergency Production Measure to Combat Coronavirus*, REUTERS (Mar. 24, 2020), http://reut.rs/3rS3MN5.

[11] *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, THE WHITE HOUSE: TRUMP WHITE HOUSE ARCHIVES (Apr. 7, 2020), https://bit.ly/3pcdiZP.

[12] *Delegating Authority Under the Defense Production Act With Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19*, 85 Fed. Reg. 26,313 (Apr. 28, 2020) (Executive Order 13917).

[13] *Id.* at 26,313–14. "CDC" is short for the "Centers for Disease Control and Prevention." "OSHA" is short for the "Occupational Safety and Health Administration."

No. 21-40622
c/w No. 21-11110

and OSHA. It also said that closed meat processing plants "should" submit documentation of their health and safety protocols and reopen "as soon as they are able after implementing the CDC/OSHA guidance for the protection of workers." While this letter was nonbinding, it concluded by noting that "action under the Executive Order and the Defense Production Act is under consideration and will be taken if necessary." Similarly, a question-and-answer page posted on the USDA's website reiterated that the letter's guidance was not mandatory, but that the agency was leaving the door open to further action under the DPA if it became necessary. Apparently, it never was. The USDA did not issue a DPA order to Tyson or any other meatpacking company.

B

The plaintiffs in this case allege that they contracted COVID-19 while working at two Tyson facilities in Texas during the first few months of 2020. Some of them died as a result. They allege that Tyson failed to follow applicable COVID-19 guidance by directing employees to work in close quarters without proper protective equipment. They also allege that Tyson knew some of its employees were coming to work sick with COVID-19 but ignored the problem, and that Tyson implemented a "work while sick" policy to keep the plant open. For example, they allege that Tyson encouraged sick employees to come into work by offering a substantial cash bonus for three months of perfect attendance.

The plaintiffs in each action filed suit in Texas state courts. Tyson removed both cases to federal district court: *Glenn* to the Eastern District of Texas, and *Chavez* to the Northern District of Texas. Both district courts granted the plaintiffs' motions to remand. Tyson appealed only the district courts' holdings that the federal officer removal statute was inapplicable, forfeiting federal question jurisdiction. We consolidated the cases on appeal.

6

No. 21-40622
c/w No. 21-11110

## II

Defendants invoking the federal officer removal statute must show that: (1) they are a "person" within the meaning of the statute; (2) they acted "pursuant to a federal officer's directions"; (3) they assert a "colorable federal defense"; and (4) there is "'a causal nexus' between the defendant's acts under color of federal office and the plaintiff's claims."[14] The parties agree that Tyson is a person within the meaning of the statute but disagree about the other three elements.

We start—and end—with the second element: whether Tyson was "acting under" a federal officer's directions. While "[t]he words 'acting under' are broad," they are "not limitless."[15] It is not enough for a private party to be "simply complying with the law."[16] A private party will only be "acting under" a federal official if their actions "involve an effort to assist, or to help carry out, the duties or tasks of the federal superior."[17] Such a relationship "typically involves 'subjection, guidance, or control.'"[18]

Tyson argues that it was "acting under" the directions of a federal superior because, from the earliest days of the pandemic, various federal officers directed it and other food suppliers to continue operations to avoid a nationwide food shortage. But the record does not support Tyson's position.

---

[14] *Latiolais*, 951 F.3d at 291 (quoting *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 396–400 (5th Cir. 1998)).

[15] *Watson*, 551 U.S. at 147.

[16] *Id.* at 152.

[17] *Id.* (emphasis omitted).

[18] *Id.* at 151 (quoting Webster's New Int'l Dictionary 2765 (2d ed. 1953)).

7

No. 21-40622
c/w No. 21-11110

Tyson first relies on the federal government's designation of the food industry as "critical infrastructure." Early in the pandemic, even as the federal government was encouraging most people to work from home and avoid discretionary travel, it encouraged employees in "critical infrastructure industr[ies]" to keep working. This message was broadcast by various federal officials, including Vice President Pence and the Department of Agriculture. For example, Tyson points to a statement from the Vice President telling food industry workers that the nation needed them "to show up and do [their] job," and promising that the government would work with their employers to keep workplaces as safe as possible.[19]

But the federal government's guidance to "critical infrastructure" industries was nonbinding. State and local authorities remained the ultimate decisionmakers on public safety matters. The list of critical infrastructure industries was created by the Cybersecurity and Infrastructure Security Agency (CISA), part of the Department of Homeland Security. CISA was clear that it created its "list of 'Essential Critical Infrastructure Workers' *to help State and local officials* as *they* work to protect their communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security." Guidance from the White House was to the same effect, instructing Americans to "[l]isten to and follow the directions of your state and local authorities."

Indeed, the food processing industry was just one of many industries designated as "critical." That diverse list included "nursing homes, . . . doctors, weather forecasters, clergy, farmers, bus drivers, plumbers, dry

---

[19] *Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing*, The White House: Trump White House Archives (Apr. 7, 2020), https://bit.ly/3pcdiZP.

cleaners, and many other workers."[20] Surely, "Congress did not deputize all of these private-sector workers as federal officers."[21] Far from deputizing huge swaths of the economy, the federal government's critical infrastructure designations amounted to strong advice to business and state and local governments that certain industries should keep operating in spite of COVID-19 risks.

Tyson tries to differentiate itself from these other private-sector designations by arguing that its relationship with the federal government was special. While Tyson has long worked closely with on-site inspectors from the USDA's Food Safety and Inspection Service, this cooperation grew more complex during the pandemic. Tyson and the federal government worked together to ensure that on-site inspections could continue while mitigating the danger to Tyson employees and FSIS inspectors. The government also suggested that it would try to help Tyson procure protective equipment.

But this only shows that Tyson was subject to heavy regulation—not that it was an agent of the federal government. Being "subject to pervasive federal regulation alone is not sufficient to confer federal jurisdiction."[22] "And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored."[23] The Court's

---

[20] *Maglioli v. All. HC Holdings LLC*, 16 F.4th 393, 406 (3d Cir. 2021) (holding that CISA's designation of nursing homes as critical infrastructure did meet § 1442(a)(1)'s "acting under" requirement); *Martin v. Petersen Health Operations, LLC*, No. 21-2959, 2022 WL 2154870, at *1 (7th Cir. June 15, 2022) (same).

[21] *Maglioli*, 16 F.4th at 406.

[22] *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 739 (8th Cir. 2021) (holding that Tyson Foods could not use § 1442(a)(2) to remove a suit against it to federal court).

[23] *Watson*, 551 U.S. at 153.

holding in *Watson* is instructive. In that case, the FTC had long conducted tests on the tar and nicotine content of cigarettes, but stopped for cost reasons.[24] The tobacco manufacturer Philip Morris started running the tests themselves "according to [Federal Trade Commission (FTC)] specifications and permitting the FTC to monitor the process closely."[25] Indeed, the FTC published the results of these tests in annual reports to Congress, just as it had when it ran the tests itself.[26] Philip Morris argued that because it carried out a task previously carried out by the government, it was "acting under" a federal official.[27] The Court disagreed. It distinguished prior cases by noting that in most of them, the defendant was "helping the Government to produce an item that it needs."[28] But Philip Morris had no contract with or payment from the federal government.[29] And while Philip Morris argued in earnest that it was exercising delegated authority, it produced no concrete evidence of a delegation.[30] "[N]either Congress nor federal agencies normally delegate legal authority to private entities without saying that they are doing so."[31]

If anything, Tyson has a much harder case to make than Philip Morris did. At least the actions that Philip Morris took had previously been carried out by the government. Not so with Tyson. Packaging and processing poultry

---

[24] *Id.* at 154.

[25] *Id.*

[26] *Id.* at 154–56.

[27] *See id.*

[28] *Id.* at 153.

[29] *Id.*

[30] *See id.* at 156–57.

[31] *Id.* at 157.

No. 21-40622
c/w No. 21-11110

has always been a private task—not a governmental one. But in other respects, Tyson is similarly situated to Philip Morris. While both were subject to close regulation and supervision, they acted in their own interests for profit. Neither acted as government contractors nor in a principal/agent arrangement with the government.[32]

While Tyson is right that a voluntary relationship isn't incompatible with delegated federal authority, the cases it cites are inapposite because they all involve defendants fulfilling government contracts. In *Isaacson v. Dow Chemical Co.*, the defendant was fulfilling a federal contract to produce "Agent Orange" for the military.[33] In *St. Charles Surgical Hospital LLC v. Louisiana Health Service & Indemnity Co.*, the defendant contracted to provide health care coverage to federal employees.[34] And *Betzner v. Boeing Co.* involved perhaps the quintessential example of private parties carrying out federal tasks: the defendant contracted to manufacture heavy bomber aircraft pursuant to detailed military guidelines and under careful monitoring and control.[35] Packaging poultry for private parties is far afield from assembling aircraft or manufacturing munitions for Uncle Sam. The problem is not that Tyson's relationship with the federal government was voluntary. The problem is the absence of any evidence of delegated authority or a principal/agent relationship at all.[36]

---

[32] *See id.* at 156.

[33] 517 F.3d 129, 138 (2d Cir. 2008).

[34] 935 F.3d 352, 356 (5th Cir. 2019).

[35] 910 F.3d 1010, 1015 (7th Cir. 2018).

[36] *See Watson*, 551 U.S. at 156 (noting the absence of "any contract, any payment, any employer/employee relationship, or any principal/agent arrangement" between Philip Morris and the government).

No. 21-40622
c/w No. 21-11110

Tyson has one final argument: that various communications from federal officials made it clear that Tyson had to keep its plants open. But the record does not support Tyson's claim. Tyson points to a long list of communications from the federal government including President Trump's proclamation declaring a national emergency, a conference call held in early March between the President and dozens of companies, a presidential tweet, guidance from the CDC and OSHA, and the Vice President's statement encouraging food industry employees to do their jobs. But none of these communications constituted an "order" or a "directive." Like the designation of various industries as "critical infrastructure," these communications merely encouraged Tyson to stay open.

Tyson's best piece of evidence of a federal directive was President Trump's invocation of the DPA in Executive Order 13917. But Executive Order 13917 had no immediate legal effect. It merely delegated the President's DPA authority to the Secretary of Agriculture. And the Secretary never saw fit to use that delegated authority. The USDA sent two letters, one to state and local governments and one to private companies, that "encouraged" meat and poultry plants to follow preexisting CDC and OSHA guidance. The USDA's question and answers webpage only confirms that the letter was not an order. It stated that the Secretary would exercise delegated DPA authority in the future "if necessary," which it never was.

## III

From the earliest days of the pandemic all the way through the issuance of Executive Order 13917, the federal government's actions followed the same playbook: encouragement to meat and poultry processers to continue operating, careful monitoring of the food supply, and support for state and local governments. Tyson was exhorted, but it was not directed.

No. 21-40622
c/w No. 21-11110

Because Tyson has not shown that it was "acting under" a federal officer's directions, we need not consider whether it meets the remaining elements of the federal officer removal statute. The district courts' judgments are AFFIRMED.