**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN DOE, on behalf of himself and all others similarly situated, | No. 23-55466 |
| *Plaintiff-Appellee*, | D.C. No. 2:23-cv-00870-DSF-JPR |
| v. | |
| CEDARS-SINAI HEALTH SYSTEM; CEDARS-SINAI MEDICAL CENTER, | OPINION |
| *Defendants-Appellants*. | |

| | |
|---|---|
| JARROD BROWNE, | No. 23-55474 |
| *Plaintiff-Appellee*, | D.C. No. 2:23-cv-01551-DSF-JPR |
| v. | |
| CEDARS-SINAI HEALTH SYSTEM; CEDARS-SINAI MEDICAL CENTER, | |
| *Defendants-Appellants*. | |

STEVEN BELTRAN; LISA REINGOLD, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees*,

v.

CEDARS-SINAI HEALTH SYSTEM; CEDARS-SINAI MEDICAL CENTER,

*Defendants-Appellants*.

No. 23-55557

D.C. No. 2:23-cv-02626-DSF-JPR

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted April 10, 2024
Pasadena, California

Filed July 5, 2024

Before: Marsha S. Berzon and Salvador Mendoza, Jr.,
Circuit Judges, and Susan R. Bolton,[*] District Judge.

Opinion by Judge Mendoza

---

[*] The Honorable Susan R. Bolton, United States District Judge for the District of Arizona, sitting by designation.

## SUMMARY[**]

### Federal Officer Removal

The panel affirmed the district court's orders remanding removed actions to state court based on a lack of federal officer jurisdiction under 28 U.S.C. § 1442(a)(1).

Three sets of plaintiffs filed class-action lawsuits in state court against their healthcare provider, Cedars-Sinai Health System and Cedars-Sinai Medical Center, alleging that Cedars-Sinai unlawfully disclosed their private medical information to third parties through tracking software on its website. Cedars-Sinai removed the suits to federal court under § 1442(a)(1), arguing that it developed its website while acting under a federal officer and at the direction of the federal government.

Following other circuits, the panel agreed with the district court that Cedars-Sinai developed its website in compliance with a generally applicable and comprehensive regulatory scheme under the Health Information Technology for Economic and Clinical Health Act, and that there was therefore no federal jurisdiction under § 1442(a)(1). Although Cedars-Sinai's website furthered the government's broad goal of promoting access to digital health records, Cedars-Sinai's relationship with the federal government did not establish that it acted pursuant to congressionally delegated authority to help accomplish a basic governmental task. Indeed, far from acting at the direction of a federal officer, Cedars-Sinai built a private

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

website of its own design to benefit its patients and staff. Accordingly, Cedars-Sinai did not meet § 1442(a)(1)'s "causal nexus" requirement.

## COUNSEL

Rachele R. Byrd (argued), Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, California; Brittany Scott and Lawrence T. Fisher, Bursor & Fisher PA, Walnut Creek, California; Scott R. Drury, Drury Legal LLC, Highwood, Illinois; Samuel M. Ward, Barrack Rodos & Bacine, San Diego, California; for Plaintiffs-Appellees.

Kyle T. Cutts (argued), Baker & Hostetler LLP, Cleveland, Ohio; Teresa C. Chow and Dyanne J. Cho, Baker & Hostetler LLP, Los Angeles, California; Paul G. Karlsgodt, Baker & Hostetler LLP, Denver, Colorado; Alexander Vitruk and James R. Morrison, Baker & Hostetler LLP, Seattle, Washington; for Defendant-Appellant.

## OPINION

MENDOZA, Circuit Judge:

As courts of limited jurisdiction, we are often precluded from hearing interesting and complex cases like the one before us today. Here, three sets of patients ("Plaintiffs") filed class-action lawsuits in state court against their healthcare provider, Defendants-Appellants Cedars-Sinai Health System and Cedars-Sinai Medical Center ("Cedars-Sinai"), alleging that Cedars-Sinai unlawfully disclosed their

private medical information to third parties through tracking software on its website. Cedars-Sinai removed the suits to federal court under 28 U.S.C. § 1442(a)(1), arguing that it developed its website while acting under a federal officer and at the direction of the federal government. The district court disagreed. Relevant here, the district court held that Cedars-Sinai developed its website in compliance with a generally applicable and comprehensive regulatory scheme and that there is therefore no federal jurisdiction under § 1442(a)(1).

After considering Cedars-Sinai's consolidated appeal, we agree with the district court's decision. Although Cedars-Sinai's website furthers the government's broad goal of promoting access to digital health records, Cedars-Sinai's relationship with the federal government does not establish that it acted pursuant to congressionally delegated authority to help accomplish a basic governmental task. Indeed, far from acting at the direction of a federal officer, Cedars-Sinai built a private website of its own design to benefit its patients and staff. Accordingly, we affirm the district court's remand orders.

## I.

In 2009, Congress passed the Health Information Technology for Economic and Clinical Health ("HITECH") Act to encourage healthcare providers to digitize medical records and make them available online to patients and medical care providers. Pub. L. No. 111-5, §§ 13001–424, 123 Stat. 115, 226–79 (2009); 42 U.S.C. § 300jj-11(b). Congress intended for these digital records—commonly referred to as electronic health records ("EHRs")—to reduce medical errors and improve quality of care, permitting patients and providers to easily view and access a patient's

medical history and facilitating the transfer of those records between facilities.  The federal government established the Office of the National Coordinator for Health Information Technology ("National Coordinator"), housed within the Department of Health and Human Services ("HHS"), to coordinate efforts like this, with the hope that the Coordinator might develop "a nationwide health information technology infrastructure that allows for the electronic use and exchange of information."  42 U.S.C. § 300jj-11(a), (b); *see also* Exec. Order No. 13335, 69 Fed. Reg. 24059 (Apr. 27, 2004).

The HITECH Act authorized HHS and its offices and agencies to promote the development of health information technology in a variety of ways.  For example, the Act directed HHS to make incentive payments, via reimbursement, to any Medicare-participating provider that is a "meaningful EHR user."   42 U.S.C. § 1395w-4(o)(1)(A)(i).  The incentive payments were not available after 2016.  *Id.* § 1395w-4(o)(1)(A)(ii); *see also Martin v. LCMC Health Holdings*, *Inc.*, 101 F.4th 410, 413 (5th Cir. 2024). Beginning in 2015, the law directed HHS to reduce Medicare reimbursement to any Medicare-participating provider that is "not a meaningful EHR user."  42 U.S.C. § 1395w-4(a)(7).  For its part, the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, created the "Meaningful Use Program" to implement the HITECH Act.  *See* 42 C.F.R. § 495 *et seq.*  Under that program, CMS developed certain objectives and measures that providers must meet to qualify as "meaningful EHR user[s]," and thus receive incentive payments or avoid reduced Medicare

reimbursements.[1]   42 C.F.R. §§ 495.20–495.24.  HHS has repeatedly used its rulemaking procedures to revise these objectives.    But they have consistently included (1) increasing engagement with digital health records and (2) providing patients the ability to view online, download, and transmit information about their health information or a hospital admission.  45 C.F.R. § 170.314(e)(1)(i);[2] *see also* 42 C.F.R. §§ 495.20(f)(12)(i)(B) (applying before 2015); 495.22(e)(8)(i), (i)(A)(1) (applying 2015 through 2018); 495.24(c)(5)(ii)(A)(1) (applying after 2019).   To receive incentive payments, participating providers must submit a "Patient Engagement" or Interoperability Report attesting to the provider's progress in accomplishing the Meaningful Use Program's objectives.  45 C.F.R. § 170.314(e)(1)(i); 42 C.F.R. § 495.24(d)(6)(ii)(B)(1).  To meet these objectives, providers often develop "online patient portals," or websites, to which patients and other users can login to view their EHRs.

Cedars-Sinai,  a  healthcare  organization  based  in California, has participated in the Meaningful Use Program since 2011.  Like other participating healthcare providers, Cedars-Sinai developed a patient portal, called My CS-Link,

---

[1] Because the Medicare reimbursement penalty is one form of an incentive—in that the recipient receives more money for complying with the regulations than it does for not complying—we use the word "incentive" to refer both to the payments available through 2016 and the reimbursement penalty imposed after 2015.

[2] It appears that 45 C.F.R. § 170.314 is no longer active.  *See* 45 C.F.R. § 170.314 (reserved); 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program, 85 Fed. Reg. 25642, 25651, 25655–56 (May 1, 2020).  But Plaintiffs seek retrospective relief, so Cedars-Sinai's conduct under § 170.314 remains relevant.

which is available on its website. Cedars-Sinai promotes the "convenience, functionality, and security" of the portal, advertising that it allows its patients to access their medical information and view test results, schedule appointments with providers, and research medical conditions. Relevant here, Cedars-Sinai's website and portal incorporate a piece of code, developed by the technology company Meta Platforms, Inc. (formerly Facebook, Inc.), which enables its hospitals to "track and share data about customer transactions." This code, colloquially called the "Meta Pixel," tracks patients' interactions with Cedars-Sinai's website and portal and relays that information back to Cedars-Sinai and to Meta. Cedars-Sinai's websites also use other website analytic tools, like Google Analytics "cookies," to track and analyze patient interactions. To take advantage of federal incentive payments, Cedars-Sinai submits yearly Interoperability Reports, attesting to its progress in implementing the Meaningful Use Program's objectives and reporting on the success of My CS-Link.

Cedars-Sinai's website, and its use of the Meta Pixel and Google Analytics tools to track user interactions, prompted three separate class action lawsuits, each filed in California Superior Court. The Plaintiffs in the three suits assert both overlapping and distinct claims,**[3]** but their allegations share

---

[3] The first lawsuit, led by John Doe, asserts claims under the California Invasion of Privacy Act, Cal. Penal Code §§ 630–32; invasion of privacy and intrusion upon seclusion in violation of California common law and the California Constitution, art. 1, § 1; California's Confidentiality of Medical Information Act, Cal. Civ. Code § 56 *et seq.*; and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; as well as claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and negligence. The second lawsuit, led by Jarrod

a common thread: Cedars-Sinai violated California law and breached its own privacy policies by using the Meta Pixel and Google Analytics tools to track and disclose sensitive medical information reflected in user interactions on Cedars-Sinai's website. According to Plaintiffs, the Meta Pixel intercepted and relayed information about Plaintiffs to Meta and other companies, including those patients' Facebook ID numbers, information about their appointments, and the search terms they used while researching health conditions. Those patients' Facebook ID numbers can be connected to patients' names on Facebook, meaning that "the private medical information a person enters onto [Cedars-Sinai's] Website" is "easily linked to the person themselves." Based on this conduct, each Plaintiff seeks remedies for violations of California law; no Plaintiff alleges claims under federal law.

Cedars-Sinai removed each lawsuit from state court to federal court, and each Plaintiff timely moved for the federal court to remand his or her lawsuit to state court. In opposition to Plaintiffs' motions for remand, Cedars-Sinai argued that removal was warranted under 28 U.S.C. § 1442(a)(1) because it "acted under" a federal officer when it developed My CS-Link. The district court disagreed and granted Plaintiffs' motions to remand, in three separate

---

Browne, asserts claims under the California Invasion of Privacy Act, California's Confidentiality of Medical Information Act, and the California Constitution. The third lawsuit, filed by Steven Beltran and Lisa Reingold, brings claims for negligence, negligence per se, breach of implied contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, breach of duty, as well as violations of the California Invasion of Privacy Act, California's Confidentiality of Medical Information Act, California's Unfair Competition Law, and the California Constitution.

orders.  The court reasoned that Cedars-Sinai's compliance with a comprehensive regulatory scheme, even when accompanied by governmental supervision and monitoring, does not mean that it "acted under" a federal officer sufficiently to permit federal officer jurisdiction under § 1442(a)(1).  According to the district court, "[t]he directions Cedars-Sinai points to are general regulations and public directives regarding the development of health information technology and electronic health records infrastructure," and "removal is not justified."  Cedars-Sinai timely appealed each order.  Those appeals were consolidated before this court.

## II.

"[U]nlike garden-variety remand orders for lack of subject-matter jurisdiction or defects in removal procedure, which are not appealable," remand orders rejecting federal officer removal under § 1442(a)(1) are appealable under 28 U.S.C. § 1447(d).  *DeFiore v. SOC LLC*, 85 F.4th 546, 554 (9th Cir. 2023); *see also City of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1106 (9th Cir. 2022).  We review de novo a district court's decision to remand a removed case.  *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 727 (9th Cir. 2015).

## III.

Although Cedars-Sinai unilaterally removed these state-court actions to federal court, that fact does not mean that they get to stay there.  The federal officer removal statute permits removal of actions brought in state court against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  To satisfy this requirement, a removing entity must establish

that: "(a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims; and (c) it can assert a colorable federal defense." *County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 755 (9th Cir. 2022) (quoting *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 986–87 (9th Cir. 2019)). Unlike removal under § 1441,[4] which is construed narrowly, federal officer removal "must be 'liberally construed.'" *DeFiore*, 85 F.4th at 553–54 (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)). But even though removal rights under the federal officer removal statute "are much broader than those under section 1441," *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006), the statute's "broad language is not limitless," *Watson*, 551 U.S. at 147. We may not interpret the federal officer removal statute considerably beyond its reach, "potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Chevron*, 32 F.4th at 757 (quoting *Watson*, 551 U.S. at 153).

Neither party disputes that Cedars-Sinai is a "person" within the meaning of § 1442(a)(1).[5] But they disagree as to whether Cedars-Sinai can (1) establish a causal nexus between federally directed conduct and Plaintiffs' claims, or (2) assert colorable federal defenses to Plaintiffs' state-law claims. Because we find that Cedars-Sinai cannot show that its development of a website and portal with embedded

---

[4] Section 1441(a) provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed" to federal court.

[5] Our precedent confirms as much. *See DeFiore*, 85 F.4th at 553 (noting that "corporations" are persons for purposes of § 1442(a)(1)).

tracking technology was federally directed, we affirm the district court's remand orders on that basis and do not address whether it can assert colorable federal defenses. *See Chevron*, 32 F.4th at 760.

## A.

To satisfy § 1442(a)(1)'s "causal nexus" requirement, Cedars-Sinai must demonstrate that it was "acting under" a federal officer in performing some "act under color of federal office," *i.e.*, that it was "involved in 'an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Goncalves ex rel. Goncalves v. Rady Childs. Hosp. San Diego*, 865 F.3d 1237, 1245 (9th Cir. 2017) (quoting *Watson*, 551 U.S. at 152). The Supreme Court's decision in *Watson v. Philip Morris Cos., Inc.* guides our analysis. There, the Court addressed federal officer removal in a lawsuit challenging a defendant cigarette company's advertising of "light" cigarettes. 551 U.S. at 146. The defendant sought removal based on its use of government-approved cigarette-testing methods, asserting that its compliance with the government's testing requirements satisfied § 1442(a)(1)'s "acting under" element. *Id.* at 146–47. The Court disagreed. Drawing on § 1442(a)(1)'s history and text, the *Watson* Court considered multiple cases where courts have authorized federal officer removal. *See id.* at 148–51 (citing, e.g., *Mesa v. California*, 489 U.S. 121 (1989); *Willingham v. Morgan*, 395 U.S. 402 (1969); and *Tennessee v. Davis*, 100 U.S. 257 (1880)). It reasoned that "the removal statute's 'basic' purpose is to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arres[t]' and bring 'to trial in a State cour[t]'" officers or agents of the federal government acting "'within the scope of their authority.'" *Id.* at 150 (alterations in original)

(quoting *Willingham*, 395 U.S. at 406). Thus, the mere "fact that a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail" does not mean the company acts under a federal officer for removal purposes. *Id.* at 145. Something more must be present, like the "delegation of legal authority," which might include "evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement." *Id.* at 156.

In *Chevron*, we distilled *Watson* into several factors, each of which may aid our determination of whether "a private person is 'acting under' a federal officer." 32 F.4th at 756. Although non-exhaustive, those factors include:

> [W]hether the person is acting on behalf of the officer in a manner akin to an agency relationship. The Court also considers whether the person is subject to the officer's close direction, such as acting under the "subjection, guidance, or control" of the officer, or in a relationship which "is an unusually close one involving detailed regulation, monitoring, or supervision." Third, the Court considers whether the private person is assisting the federal officer in fulfilling "basic governmental tasks" that "the Government itself would have had to perform" if it had not contracted with a private firm. Finally, taking into account the purpose of § 1442(a)(1), the Court has considered whether the private person's activity is so closely related to the government's implementation of its federal

> duties that the private person faces "a significant risk of state-court 'prejudice,'" just as a government employee would in similar circumstances, and may have difficulty in raising an immunity defense in state court.

*Id.* at 756–57 (citations omitted) (discussing *Watson*, 551 U.S. at 151–54); *see also Cabalce*, 797 F.3d at 729; *Goncalves*, 865 F.3d at 1246–47; *Leite v. Crane Co.*, 749 F.3d 1117, 1120, 1124 (9th Cir. 2014).

Our circuit has not yet applied these *Watson*-derived factors to address whether a healthcare provider acts at the direction of the National Coordinator when it creates an EHR website with an embedded tracking code. Thankfully, we are not staring at blank computer screens, learning how to program "Hello, World!"[6] The Third, Fifth, and Eighth Circuits have each considered this issue, and all three have held that the federal officer removal statute does not support removal for suits challenging conduct like Cedars-Sinai's.

We start with the first mover: the Eighth Circuit in *Doe v. BJC Health System*, 89 F.4th 1037, 1043 (8th Cir. 2023). Like Cedars-Sinai, the *BJC Health System* defendant created an online portal for its patients to access EHRs, and that portal contained tracking code that allegedly disclosed those patients' private data to third parties, including Meta and Google LLC. *Id.* at 1040–41. In response to the plaintiffs' motion to remand, the *BJC Health System* defendant invoked

---

[6] To ruin a joke with explanation: when students learn a new programming language, they often start by creating a computer program that displays the message "Hello, World!" *See* Brian W. Kernighan & Dennis Ritchie, The C Programming Language 9–10 (1st ed. 1978).

federal officer removal jurisdiction, arguing that "when it created and operated the portal, it acted under HHS's or the [National] Coordinator's authority." *Id.* at 1041. The Eighth Circuit was not persuaded. Relying on *Watson*, it reasoned that § 1442(a)(1) permits removal only when a defendant "performs a 'basic governmental task'" that "involves a 'delegation of legal authority' from a federal entity." *Id.* at 1043 (quoting *Watson*, 551 U.S. at 153, 156). Although it conceded that the development of EHRs may well be "important" under the HITECH Act and Meaningful Use Program, the court held that "[t]he design of private websites is not—and has never been—a basic *governmental* task." *Id.* at 1045. Instead, the defendant "created and operated an online portal for its patients," essentially "doing its own" business. *Id.* So reasoning, the Eighth Circuit affirmed the district court's order, finding that the defendant's development of "a private website" and receipt of "a federal subsidy" was "insufficient for removing a case under 28 U.S.C. § 1442(a)(1)." *Id.* at 1047.

Not long after the Eighth Circuit's decision in *BJC Health System*, the Third Circuit issued its decision in *Mohr v. Trustees of the University of Pennsylvania*, 93 F.4th 100, 103 (3d Cir. 2024). It too rejected the defendant's theory that it acted under a federal officer when it shared "patients' identities, sensitive health information, and online activity from its patient portals with Facebook in violation of [state] privacy law." *Id.* Relying heavily on *BJC Health System* and *Watson*, the *Mohr* court considered whether the government delegated legal authority pursuant to the Meaningful Use Program and HITECH Act to the defendant "to operate a patient portal *on behalf of* the government." *Id.* at 105. Like the *BJC Health System* court, it answered "no." The Third Circuit reasoned that the defendant had merely

demonstrated "compliance with federal laws and regulations" when operating its own portal, which is insufficient to show that it had acted at the direction of a federal officer. *Id.* at 105 (citation and internal quotation marks omitted). After all, "[a]dvancing governmental policy while operating one's own business is not the same as executing a delegated governmental duty." *Id.* The court also dismissed the defendant's argument that its "contractual relationship" with the federal government permitted removal. *Id.* at 105–06. Invoking *Watson*, the *Mohr* court dug into the "nature of the relationship between the private party and the federal government," and found that the defendant was "not producing or operating any patient portal for the government." *Id.* (citing *Watson*, 551 U.S. at 152–54). So the Third Circuit also affirmed remand.

The Fifth Circuit joined the Eighth and Third Circuits with its decision in *Martin v. LCMC Health Holdings, Inc.*, 101 F.4th 410, 412 (5th Cir. 2024). The *Martin* defendant, like the defendants in the Eighth and Third Circuit cases, sought removal in an action alleging that it "embedded tracking pixels onto its website that shared [the plaintiff's] private health information with third-party websites." *Id.* It too urged the court to find that it acted under the National Coordinator, pursuant to the HITECH Act and the Meaningful Use Program, when it "created and operated its online portal, accepted federal incentive payments, and potentially incurred liability under [state] law through its use of tracking pixels." *Id.* at 414–15. The *Martin* court, echoing *Mohr* and *BJC Health System*, invoked *Watson* and held that the defendant "cannot show that its relationship with the government involved anything more than regulation." *Id.* at 415–16 (citing *Watson*, 551 U.S. at 152–57). Like the defendants in those other cases, the *Martin*

defendant "did not assist or carry out any tasks of the government"; it was not an "instrumentality of the government"; and its "online patient portal was operated by [the defendant] and existed for the benefit of [the defendant's] patients and staff." *Id.* at 415. Accordingly, "[t]he operation of the online patient portal [was] not pursuant to a federal officer's directive because the federal government would not have created an online patient portal if [the defendant] had chosen not to do so." *Id.* (citing *BJC Health Sys.*, 89 F.4th at 1047; *Mohr*, 93 F.4th at 105). Thus, the healthcare provider's "relationship with the federal government [was] too attenuated to show any delegation of legal authority" to permit removal of plaintiff's lawsuit. *Id.* at 416.

## B.

Here, Cedars-Sinai presents many of the same arguments in favor of removal as the *BJC Health System*, *Mohr*, and *Martin* defendants. Like those defendants, Cedars-Sinai points to the HITECH Act's and Meaningful Use Program's directives, arguing that the federal government regulated and monitors its development of the My CS-Link portal and associated website. Cedars-Sinai also argues that it is helping the government produce a nationwide, interoperable technology infrastructure for health information and, absent its assistance, the National Coordinator would be left to complete his mission alone. Finally, Cedars-Sinai points to its past receipt of federal incentive payments and its continuing efforts to avoid reduced Medicare reimbursement payments through compliance with federal reporting requirements as evidence of delegated government authority. Like our sister circuits, we are unpersuaded by these arguments.

First, we agree with *BJC Health System*: Cedars-Sinai did not assist the National Coordinator with delegated "basic governmental tasks" when it built its patient portal and website using tracking technology. *See* 89 F.4th at 1043. As the *Watson* Court noted, § 1442(a)(1) does not permit removal just because "a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail." 551 U.S. at 145. Acting under a federal officer entails more than "simply *complying* with the law"; it requires "*helping* the Government to produce an item that it needs." *Id.* at 152–53 (second emphasis added). This generally involves a "delegation of legal authority" from a federal entity. *Id.* at 156. In *City of Honolulu v. Sunoco LP*, for example, we rejected multiple theories of federal officer removal jurisdiction related to the defendant's production of oil and gas through offshore drilling operations. 39 F.4th at 1107–10. Despite Congress's oversight of those offshore-drilling leases and its recognition that "offshore oil resources are a national security asset," we reasoned that offshore drilling and oil production is not a "basic governmental task." *Id.* at 1108–09. It is, instead, a highly regulated industry that the defendants entered. *Id.* By contrast, in *Goncalves*, we found federal officer jurisdiction warranted over claims arising from the defendant's administration of a federally created health-insurance plan. 865 F.3d at 1246. But we did so because the *Goncalves* defendant acted pursuant to an express delegation of responsibility by Congress, essentially fulfilling the role of a claims processor for the government. *Id.* at 1246–47.

Cedars-Sinai's conduct more closely resembles the *Watson* and *Sunoco* defendants' conduct than the *Goncalves* defendant's conduct. Unlike the defendant in *Goncalves*, or even the analogous healthcare provider in *Mohr*, Cedars-

Sinai does not allege that it has contracted with the government to provide a service or to create a product on its behalf. *See Goncalves*, 865 F.3d at 1246; *Mohr*, 93 F.4th at 105–06. Instead, Cedars-Sinai has presented evidence that it has complied with the broad requirements of the HITECH Act, which apply to any healthcare provider participating in the Meaningful Use Program. That Program's requirements do not show an express delegation of authority to Cedars-Sinai to accomplish a basic governmental task on the National Coordinator's behalf. Far from it. Cedars-Sinai *chose* to satisfy the Meaningful Use Program's objectives by building a patient portal using tracking technology. That decision does not mean Cedars-Sinai's My CS-Link is a federal government website, or that it is operated on the government's behalf or for the federal government's benefit.

To be sure, Cedars-Sinai's conduct might "advance the government's policy by operating a patient portal that meets certain objectives and measures." *Mohr*, 93 F.4th at 105. But the portal is the healthcare provider's creation, and there is no evidence that the government would create such a portal absent Cedars-Sinai's participation. *See Martin*, 101 F.4th at 415. Put simply, it is a private website, built by a private entity, to serve that private entity's patients and staff. Given that context, Cedar Sinai cannot establish that it is a subject of the government's direction, thus entitling it to a federal forum to put on its federal defenses.

Anticipating this conclusion, Cedars-Sinai asks us to consider the government's requirements in 42 C.F.R. § 495.20(f)(12)(i)(B) and 45 C.F.R. § 170.314(e)(1)(i). But neither of those regulations delegate legal authority to accomplish a basic governmental task. Section 495.20(f)(12)(i)(B) states that an objective of the Meaningful Use Program is to "provide patients the ability

to view online, download, and transmit information about a hospital admission." Likewise, § 170.314(e)(1)(i) requires healthcare providers to submit Interoperability Reports on "[p]atient engagement" with "EHR technology" that "provide[s] patients . . . with an online means to view, download, and transmit to a 3rd party" certain specified data. These regulations do not *require* Cedars-Sinai to build a specific type of website or patient portal—much less a portal that uses the tracking technology described in the complaint. Nor do they impose sufficient federal oversight to demonstrate that Cedars-Sinai acted under the direction of a federal officer. *Watson*, 551 U.S. at 155–56 (rejecting federal officer removal jurisdiction, even though defendant "assumed responsibility for cigarette testing," permitted a federal agency "to monitor the process closely," and reported its results to a federal agency). Instead, the regulations grant healthcare providers considerable discretion to accomplish the Program's goals, without the "requisite federal control or supervision" that might warrant the exercise of federal officer jurisdiction. *Cabalce*, 797 F.3d at 728.

Nor do we agree that Cedars-Sinai's receipt of federal "incentive payments" warrants the exercise of federal officer removal jurisdiction. The *Watson* Court indicated that evidence of "payment" might show that a defendant acted under color of federal authority. 551 U.S. at 156. But it meant "payment" of the type arising from a "contract," "employer/employee relationship, or any principal/agent arrangement." *Id.* Neither the Supreme Court nor this court has held that federal incentives for compliance with federal regulations constitutes "payment" sufficient to render federal officer removal appropriate. Indeed, at least two of our sister circuits have squarely held the opposite. *See Mays*

*v. City of Flint*, 871 F.3d 437, 444 (6th Cir. 2017) ("[T]he receipt of federal funding alone cannot establish a delegation of legal authority."); *see also BJC Health Sys.*, 89 F.4th at 1045 (citing *Mays* and reasoning similarly); *cf. Mohr*, 93 F.4th at 105–06 (rejecting argument that incentive payments indicate that the defendant acted as a government contractor); *Martin*, 101 F.4th at 414–15 (impliedly dismissing argument that acceptance of "federal incentive payments" showed the defendant "acted 'pursuant to' a federal officer's direction"). In our view, construing *Watson* to permit removal based on incentive payments would open the floodgates to a myriad of entities hoping to invoke federal officer removal jurisdiction, impermissibly expanding the scope of § 1442(a)(1) beyond its purview. *Cf. Watson*, 551 U.S. at 153. That view is not supported by the removal statute, precedent, or the specific facts of this case.

## IV.

Our decision today puts us in good company, and Cedars-Sinai provides no "compelling reason" to "create a circuit split" by expanding the reach of federal officer removal jurisdiction. *Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017). So we decline its invitation to do so, and we affirm the district court's remand orders.

**AFFIRMED.**