**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

———————————————————

JOHN DOE, Individually and on behalf of all others similarly situated,

    Plaintiff - Appellee,

v.

INTEGRIS HEALTH, INC.,

    Defendant - Appellant.

No. 23-6209

———————————————————

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:23-CV-00728-HE)**

———————————————————

Kyle T. Cutts, Baker & Hostetler LLP, Cleveland, Ohio (Paul G. Karlsgodt, Baker & Hostetler LLP, Denver, Colorado; Lisa A. Houssiere, Baker & Hostetler LLP, Houston, Texas; Larry D. Ottaway and Andrew M. Bowman, Foliart, Huff, Ottaway & Bottom, Oklahoma City, Oklahoma, on the briefs), for Defendant – Appellant.

Michael C. Iadevaia, Stranch, Jennings & Garvey, PLLC, Nashville, Tennessee (J. Gerard Stranch IV, Stranch, Jennings & Garvey, PLLC; Lynn A. Toops, Cohen & Malad, LLP, Indianapolis, Indiana; Matthew Dean Alison and Jason Bjorn Aamodt, Indian & Environmental Law Group, Tulsa, Oklahoma, with him on the briefs), for Plaintiff – Appellee.

———————————————————

Before **TYMKOVICH**, **McHUGH**, and **ROSSMAN**, Circuit Judges.

———————————————————

**McHUGH**, Circuit Judge.

———————————————————

Plaintiff John Doe filed a putative class action lawsuit against Defendant Integris Health, Inc. In his complaint, Mr. Doe alleges that Integris collected confidential health information from people who visited its website and unlawfully shared that information with third parties, like Google and Facebook.

Mr. Doe brought his suit in Oklahoma state court and asserted only state law claims. Integris responded by removing the case to federal court under the federal officer removal statute, asserting it was "acting under" the direction of a federal officer. *See* 28 U.S.C. § 1442(a)(1). Integris argued it acted under a federal officer because it created its website to help the federal government achieve its objective of ensuring patients can access and use electronic health records ("EHR").

The federal district court remanded the case, concluding Integris had not shown it was "acting under" the direction of a federal officer. We agree with this conclusion and affirm.

## I.    BACKGROUND

### A.    *Factual History*[1]

In 2004, President George W. Bush issued an executive order directing the Secretary of Health and Human Services (HHS) to establish the position of National Health Information Technology Coordinator (the "National Coordinator"). Exec.

---

[1] "When courts review a notice of removal for jurisdiction, they may consider the complaint as well as documents attached to the notice of removal." *Bd. of Cnty. Comm'rs v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1247 n.1 (10th Cir. 2022). Accordingly, these facts are drawn from Mr. Doe's complaint as well as the documents attached to Integris's Notice of Removal.

Order No. 13,335, 69 Fed. Reg. 24059 (Apr. 27, 2004). The National Coordinator's

purpose is "to provide leadership for the development and nationwide

implementation of an interoperable[2] health information technology infrastructure to

improve the quality and efficiency of health care." App. Vol. II at 231.

In 2009, Congress codified the position of National Coordinator in the Health

Information Technology Act (the "HITECH Act" or the "Act"). *See* Am. Recovery &

Reinvestment Act, Pub. L. No. 111-5, 123 Stat. 115, 230 (2009) (codified at

42 U.S.C. § 300jj-11(a)). The Act directs the National Coordinator to act "in a

manner consistent with the development of a nationwide health information

technology infrastructure that allows for the electronic use and exchange of

information." 42 U.S.C. § 300jj-11(b). Additionally, the HITECH Act directed HHS

to make incentive payments to healthcare providers for their "adoption and

meaningful use of certified EHR technology." *Id.* § 1395w-4(o). Starting in 2015,

healthcare providers that were not "meaningful EHR user[s]" received reduced

Medicare reimbursements. *Id.* § 1395w-4(a)(7)(A)(i).

The Centers for Medicare and Medicaid Services (CMS)[3] promulgated

regulations explaining how providers qualify as meaningful EHR users. 42 C.F.R.

---

[2] "Interoperability refers to the ability of IT systems to share and use electronic information." C. Stephen Redhead, Cong. Rsch. Serv., R40161, The Health Information Technology for Economic and Clinical Health (HITECH) Act 1 n.2 (2009).

[3] CMS is a federal agency within HHS and is responsible for administering Medicare, Medicaid, and related programs.

3

§ 495.2–.370. These regulations and the associated incentives are referred to as the "Promoting Interoperability Program" or the "Meaningful Use program" ("MUP"). *Id.* § 495.4. The MUP regulations require healthcare providers to certify annually that they are in compliance. *Id.* at § 495.40; 45 C.F.R. § 170.315. Certification requires providers to report on patients' ability "to use internet-based technology to view, download, and transmit their health information to a 3rd party." 45 C.F.R. § 170.315(e)(1)(i).

Integris is a private healthcare provider in Oklahoma that has been a MUP participant for years. Relevant to its MUP participation, Integris has a public-facing website that it encourages patients to use for, among other things, searching for physicians, researching health information, scheduling appointments, and paying bills. The public-facing website also links to Integris's password-protected patient portal that patients use to access EHR. Some of Integris's MUP funds went toward developing the patient portal.

Integris contends that for it to meet MUP requirements, and thus avoid reduced Medicare reimbursements, its "patients must be aware of the patient portal, understand the benefits and options that are available to them within the patient portal, and find the patient portal easy to use." *Id.* Thus, Integris implemented tracking technology—called "trackers" or "pixels"—into its public-facing website to better understand the "usability" of its website and patient portal. App. Vol. I at 25; App. Vol. II at 223.

4

According to Mr. Doe, trackers or pixels are "a snippet of code embedded into a website that tracks information about its visitors and their website interactions." App. Vol. I at 25–26. To illustrate, "[w]hen a person visits a website with an embedded pixel, the pixel tracks 'events' (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted." *Id.* at 26. The pixel then "transmits the event information back to the website server and to third parties," like Facebook, Google, and Microsoft.[4] *Id.* at 26, 29. The third parties use the information "to create targeted advertisements based on the medical conditions and other information disclosed to [Integris]." *Id.* at 28. For example, if a patient researched hypertension on Integris's website, Facebook could "sell a drug company targeted ad space for blood pressure medication" on the patient's Facebook feed. Appellee's Br. at 5. In exchange for patient information, the third parties provide Integris with "enhanced advertising services" that allow Integris to measure the impact of its advertisements. App. Vol. I at 49.

### B.    *Procedural History*

Mr. Doe, an Integris patient, filed this class action lawsuit in Oklahoma state court. The complaint alleges that Integris's use of trackers violates Health Insurance Portability and Accountability Act (HIPAA) standards, industry standards, the

---

[4] Mr. Doe alleges that Integris has embedded several trackers, including Facebook Pixel (or "Meta Pixel"), Google Analytics, Google Tag Manager, Microsoft Universal Event Tracking, LinkedIn, Bidtellect, StackAdapt, Reddit Ads, DoubleClick, MediaMath, and Trade Desk.

privacy policy posted on Integris's website, and the class members' reasonable privacy expectations. The complaint asserts state law claims for negligence, invasion of privacy, breach of implied contract, unjust enrichment, breach of fiduciary duty, and violation of the Oklahoma Consumer Protection Act.

Integris removed the case, asserting jurisdiction under the federal officer removal statute. *See* 28 U.S.C. § 1442(a)(1). Integris argued removal was warranted because it acted under a federal officer by participating in the MUP and creating its patient portal. Mr. Doe moved to remand the case. The district court granted Mr. Doe's motion and remanded to state court, concluding that Integris was "simply complying with federal laws and regulations," which is "insufficient to establish that [Integris] was acting under a federal officer." App. Vol. III at 459. Integris timely appealed.

## II.     DISCUSSION

The federal officer removal statute permits removal of a state action that is against "any person acting under" an officer of the United States "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The statute's purpose is to protect the federal government from "[s]tate-court proceedings [that] may reflect 'local prejudice' against unpopular federal laws or federal officials." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007) (quoting *Maryland v. Soper*, 270 U.S. 9, 32

(1926)). The removal statute must be "liberally construed" to achieve this purpose.[5]

*Id.* at 147 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)).

"[P]rivate defendants may remove under § 1442(a)(1) if they can show (1) they acted under the direction of a federal officer, (2) the claim has a connection or association with government-directed conduct, and (3) they have a colorable federal defense to the claim or claims." *Bd. of Cnty. Comm'rs v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1251 (10th Cir. 2022). We review a district court's removal determination de novo. *Id.* at 1250.

Integris argues that it is acting under a federal officer because it has taken steps to ensure its patients can engage meaningfully with their EHR. We disagree. Integris is not "acting under" a federal officer because it has shown, at most, that it is highly regulated. As we now explain, that showing is insufficient under *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007), and *Board of County Commissioners v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1251 (10th Cir. 2022). Accordingly, we join four of our sister circuits that have held removal is improper in materially identical cases.

In *Watson*, the Supreme Court provided a comprehensive overview of what is required for the "acting under" showing. 551 U.S. at 151–53. Its analysis centered on the text, history, and purpose of the federal officer removal statute. *Id.* Looking first

---

[5] The liberal construction of 28 U.S.C. § 1442(a)(1) is a departure from the normal presumption against federal jurisdiction. *Suncor*, 25 F.4th at 1250–51.

to the statutory text, the Supreme Court explained that "under" means a "relationship [that] typically involves 'subjection, guidance, or control.'" *Id.* at 151 (quoting Webster's New International Dictionary 2765 (2d ed. 1953)). Additionally, "precedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152. However, "help and assistance" should not be understood in their colloquial sense. *Id.* at 152. "Taxpayers who fill out complex federal tax forms, airline passengers who obey federal regulations prohibiting smoking, for that matter well-behaved federal prisoners, all 'help' or 'assist' federal law enforcement authorities in some sense of those words." *Id.* "But that is not the sense of 'help' or 'assist' that can bring a private action with the scope" of the statute—"the scope of the statute does *not* include simply *complying* with the law." *Id.*

The "upshot" of this guidance "is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *Id.* at 153. "A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Id.* This is true "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* If complex regulation were sufficient, the removal statute's scope would be expanded "considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Id.* Moreover, a broad reading would not serve the statute's purpose because when a highly regulated industry

8

merely complies with a regulatory order, there is not "a significant risk of state-court 'prejudice.'" *Id.* at 152. "Nor is a state-court lawsuit brought against such a company likely to disable federal officials from" enforcing federal law or "likely to deny a federal forum to an individual entitled to assert a federal claim of immunity." *Id.*

Applying these principles in *Watson*, the Supreme Court held that a private company's removal was improper. *Id.* at 153–57. The *Watson* plaintiffs sued Philip Morris for deceptive business practices, alleging it advertised its "light" cigarettes as containing lower tar and nicotine levels than were actually present. *Id.* at 146. Philip Morris removed to federal court, arguing it was "acting under" a federal officer because "the complaint attacked [its] use of the *Government's* method of testing cigarettes." *Id.* at 146. Philip Morris further argued it was comparable to private contractors, which are routinely held to be within the ambit of § 1442(a)(1). *Id.* at 153. But the Supreme Court distinguished private contractors from highly regulated industries: "The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks." *Id.* at 153. To illustrate, in a prior case, removal was proper because the defendant "fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war." *Id.* at 153–54. Had the defendant not performed that task, "the Government itself would have had to perform." *Id.* at 154. Conversely, Philip Morris—although highly regulated—merely complied with federal law and did not fulfill a basic government task. *Id.* Philip Morris's removal was thus improper. *Id.*

9

We relied on *Watson*'s analysis in *Suncor*. There, municipalities sued energy companies, alleging the companies' fossil fuel production contributed significantly to climate change that harmed the municipalities. 25 F.4th at 1247. The energy companies removed to federal court. *Id.* They argued federal jurisdiction existed because one of the companies, Exxon, leases "portions of the outer continental shelf of the United States." *Id.* Because of those leases, "Exxon [was] required to conduct drilling 'in accordance with' federally approved exploration, development, and production plans and conditions." *Id.* The leases also allowed the government "the right to obtain 'prompt access' to facilities and records of [Exxon] for the purpose of federal safety, health, or environmental inspections." *Id.* at 1248. Finally, the leases allowed the government the right of first refusal in time of war or when prescribed by the President of the United States. *Id.*

Applying *Watson*, we held removal was improper because Exxon had not shown it was "acting under" a federal officer. *Id.* at 1251–54. Exxon complied with complex contractual terms, but it did not "help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products." *Id.* at 1253. In other words, Exxon did not "stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract." *Id.* And although the government purchased some of Exxon's fuel produced via the leases, the leases did "not require Exxon to tailor fuel production to detailed government specifications aimed at satisfying pressing federal needs." *Id.* Additionally, the federal government did not dictate Exxon's drilling operations or

tell it how much fuel to sell, so the leases did not demonstrate close supervision by the federal government. *Id.*

*Watson* and *Suncor* demonstrate that Integris does not carry out the federal government's tasks, so it is not "acting under" a federal officer.[6] While President Bush's executive order, the HITECH Act, and the MUP regulations show that patient access to EHR is important to the federal government, they do not show that providing EHR access is a "basic government need[]," a "key government task[]," or an "essential government product[]." *Id.* Nor do these government acts demonstrate that without Integris's efforts, the federal government would need to provide patients access to their EHR. *See id.* Moreover, Integris tacitly acknowledges that Integris is not carrying out government tasks, stating that providing access to EHR is something the government "*could only accomplish through the private sector*." Reply Br. at 5 (emphasis added).

But even if providing EHR access were a government task, Integris has not shown that tracking technology is part of that government task. Rather, Integris concedes that it could participate in the MUP *without* using trackers. Because the complained-of conduct is the use of trackers, Integris's concession that tracking

---

[6] *Watson* and *Suncor* both suggested that a delegation of authority could demonstrate a private actor is "acting under" a federal officer. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 154–57 (2007); *Suncor*, 25 F.4th at 1254. Integris did not make a delegation argument, so we do not consider delegation. But importantly, Integris acknowledges the government cannot create patient portals for private healthcare providers, indicating there is no authority to be delegated.

11

technology is not required is fatal. *Martin v. LCMC Health Holdings, Inc.*, 101 F.4th 410, 415 (5th Cir. 2024) (explaining that a healthcare provider participating in the MUP "was not required to embed tracking pixels onto its website when it created the online patient portal"); *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 917 (9th Cir. 2024) (explaining that the MUP does not require healthcare providers "to build a specific type of website or patient portal—much less a portal that uses [] tracking technology").

Integris's arguments to the contrary are unpersuasive. First, it points out that HHS and CMS designed a website and patient portal for Medicare beneficiaries. But just because the government created a patient portal for its own patients does not mean it would be obligated to create a patient portal for Integris's patients. Nor does this demonstrate that Integris's decision to use tracking technology fulfilled a basic government task.

Integris next argues that its involvement in the MUP "involves strict oversight by HHS." Appellant's Br. at 22. The "strict oversight" includes: (1) the incentives for participating in the MUP, (2) the reduction in Medicare reimbursements if Integris does not comply, (3) the requirement that Integris annually certify its compliance, and (4) the federal government's "Patient Engagement Playbook," which Integris claims "expressly told health care providers how to design their public websites, at least when it came to their patient portals." *Id.* at 33.

At best, this evidence demonstrates that Integris is highly regulated. Receiving incentives and avoiding reimbursement reductions does not demonstrate close

direction by the federal government. If it did, the federal officer removal statute would permit removal in countless scenarios where private parties voluntarily engage in certain conduct in exchange for payment.[7] *Watson* cautioned against applying the statute that broadly. *See* 551 U.S. at 153. Similarly, Integris's annual self-certification epitomizes the "usual regulator/regulated relationship" and demonstrates only that Integris complies with the MUP's requirements. *Id.* at 157; *see also id.* at 152 (stating that "simply *complying* with the law" is insufficient). And finally, the "Patient Engagement Playbook" that Integris quotes provides only "tips and best practices" collected "from clinicians and health systems"—it does not dictate how Integris must design its website, nor does it require trackers.[8]

In short, Integris voluntarily participates in a government initiative that imposes some requirements. But the government does not require Integris to use trackers or otherwise control how Integris provides access to EHR. As a result, Integris is not "acting under" a federal officer. *See Suncor*, 25 F.4th at 1253

---

[7] One court posited that relying on the MUP's payment structure to justify federal officer removal "could be likened to concluding that a private individual who voluntarily participates in the federal government's clean vehicle initiative and adheres to the conditions of the initiative in exchange for a tax credit is also doing so under the 'close direction' of the federal government." *Doe v. Valley Health Sys., Inc.*, No. 23-cv-185-EP-ESK, 2023 WL 6997301 (D.N.J. Oct. 24), *appeal filed*, *Barnett v. Valley Health Sys., Inc.*, No. 23-3049 (3d Cir. 2023).

[8] *See The ONC Patient Engagement Playbook*, HealthIT.gov, https://www.healthit.gov/playbook/pe/ (last visited Dec. 3, 2024) ("The Playbook is . . . a compilation of *tips and best practices* we're collecting from clinicians and health systems like yours." (emphasis added)).

(explaining that drilling leases did not evince "close supervision" because the government did not control how Exxon drilled for oil and gas, did not control how Exxon developed its product, and did not instruct Exxon on how much fuel to sell). The Third, Fifth, Eighth, and Ninth Circuits have reached this same conclusion in materially identical cases. *Mohr v. Trs. of Univ. of Pa.*, 93 F.4th 100, 105–06 (3d Cir. 2024); *Martin v. LCMC Health Holdings, Inc.*, 101 F.4th 410, 416 (5th Cir. 2024); *Doe v. BJC Health Sys.*, 89 F.4th 1037, 1046 (8th Cir. 2023), *denying reh'g & reh'g en banc*, 2024 WL 507502 (8th Cir. 2024); *Doe v. Cedars-Sinai Health Sys.*, 106 F.4th 907, 918 (9th Cir. 2024).

Integris acknowledges this contrary authority but contends the cases from the Third and Eighth Circuits are factually distinct for two reasons. First, Integris argues that in those cases, the plaintiffs alleged the privacy violations occurred within the patient portal, while Mr. Doe alleges the privacy violations occurred only on the public-facing website. But the Third and Eighth Circuits did not indicate this was an important distinction, and we do not see how it matters. Whether the allegations concern the public-facing website or the patient portal, Integris has not shown it is carrying out government tasks.

Integris next contends that the Third and Eighth Circuits did not consider guidance documents, such as the Patient Engagement Playbook and a Strategic Plan. But as explained, that Playbook offers "tips and best practices" and is not indicative of a federal officer closely supervising a private actor fulfilling government tasks. Similarly, the other documents show only that access to EHR is important to the

government. They do not demonstrate that providing patients of private healthcare providers access to EHR is a duty of the federal government, nor do they demonstrate that tracking technology is required by the federal government. Accordingly, these documents are not material.

Finally, we acknowledge that two district courts have concluded removal is appropriate in this situation. *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020); *Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020), *rejected by Mohr*, 93 F.4th 100. But these cases were decided early on, and numerous courts have declined to adopt their "broad interpretation" of the removal statute. *See, e.g.*, *Colleton v. UMass Mem'l Health Care, Inc.*, No. 22-cv-40154-ADB, 2023 WL 4538178, at *5 (D. Mass. July 13, 2023) (collecting cases); *see also BJC Health Sys.*, 89 F.4th 1044–45 (explaining why the contrary decisions are unpersuasive). Likewise, we find these district court cases unpersuasive because they required only that the defendant provided some assistance towards an initiative that is important to the government. *See ProMedica*, 2020 WL 7705627, at *3 ("The aim of [the MUP] is to create a unified system of patient electronic health records. Because Defendant's participation assisted the federal government in achieving that *goal*, Defendant has satisfied the 'acting under' prong." (emphasis added)); *UPMC*, 2020 WL 4381675, at *4 ("It is enough that the complained-of conduct took place while the private entity provided assistance to the federal superior."). Under *Watson*, assistance with an important initiative is not enough. *See* 551 U.S. at 152 (explaining that although "an English

15

speaker might say that one who complies with the law 'helps' or 'assists'" the government, that type of help and assistance is insufficient under the removal statute). Consequently, these contrary cases are not persuasive.

For these reasons, we join the courts holding that private entities participating in the MUP are not "acting under" a federal officer. And because Integris has failed to show it was "acting under" a federal officer, removal was improper, and we need not consider the other requirements for federal officer removal.

## III.    CONCLUSION

Because Integris has not shown removal was justified under 28 U.S.C. § 1442, we AFFIRM the district court's order remanding this case to state court.